SWENSON, Respondent v. CHEVRON CHEMICAL CO.,
Appellant

(234 N.W.2d 38)

(File Nos. 11498, 11502. Opinion filed October 17, 1975)

**Woods, Fuller, Shultz & Smith,** and **Timothy J. Nimick,** Sioux Falls, for defendant and appellant.

**Ronald C. Aho,** Brookings, for plaintiff and respondent.

WINANS, Justice.

Merle Swenson, plaintiff-respondent, farms approximately 600 acres of land near Garretson, South Dakota. In the spring of 1972 he planted 300 acres of corn in various fields. There were about 245 acres of land which had been previously planted with corn and all these required treatment with a corn rootworm insecticide. Two different insecticides were used. One was Ortho

Bux Ten Granular which is manufactured by defendant-appellant and marketed "for control of corn rootworm larvae." Swenson purchased 2,100 pounds of Bux Ten in April of 1972 from the Luverne (Minnesota) Farm Store at a cost of $717. This insecticide was applied to some 225 acres, resulting in an application rate of over nine pounds per acre. Having exhausted his supply of Bux before treating all the acreage, Plaintiff purchased 180 pounds of another insecticide, Thimet, and applied it to the 20 acres remaining. These were situated in a 100 acre field otherwise treated with Bux.

The application of the insecticides took place simultaneously with corn planting between May 3rd and May 20th and the corn was thereafter sprayed for weeds, cultivated, and hoed with a rotary hoe. On July 14th Plaintiff observed that virtually all of the corn he had treated with Bux Ten was leaning severely ("lodged") while all of the corn treated with Thimet stood erect as did the first-year corn which did not require insecticide. On the previous evening 8/10 of an inch of rain had fallen, accompanied by wind.

Plaintiff immediately notified George Gulla of the Luverne Farm Store that his Bux-treated corn was badly lodged. Gulla and M. W. Karns, a sales representative for Defendant, examined the corn fields and Swenson testified that Karns was of the opinion that Swenson had a severe corn rootworm problem. Plaintiff also contacted Glen Schrader, Minnehaha County Agricultural Extension Agent, who in turn contacted Dr. Benjamin H. Kantack, extension entomologist for the Cooperative Extension Service of South Dakota State University at Brookings. They both inspected the cornfields in question and Dr. Kantack testified at trial that he observed corn rootworm damage in the fields treated with Bux Ten to the extent that the corn was "severely injured by corn rootworm." Dr. Kantack also testified that he observed no corn rootworm damage in any of the Thimet-treated corn or in the untreated first-year corn. Dr. Kantack was asked if corn rootworm was effectively controlled on the Bux fields he had observed and he answered in the negative. When asked if he had observed any control of the corn rootworm he said "If there was any control there I couldn't detect it." When questioned about control of corn rootworm in the Thimet

field area he stated that the corn rootworm had been controlled there.

Dr. Kantack testified as to the manner in which corn rootworm larvae damage growing corn. When the larvae first hatch they migrate to roots and begin feeding on the root and roothairs, actually burrowing into the roots and eating the entire root system. This affects the corn's uptake of nutrients, fertilizer and moisture and ultimately reduces the yield. A corn plant may nevertheless continue to grow under certain conditions and may regenerate new roots. It grows upward, but in a curved fashion, and is referred to as "goosenecked." With an impaired root system the ultimate yield is diminished. Once the corn had been lodged due to a rootworm infestation, no corrective action can be taken to clear up the infestation or minimize damage, other than to harvest the corn with a combine rather than a straight corn picker.

Plaintiff harvested his corn in October of '72 and it was necessary for him to hire a custom combiner at $6.50 per acre because of the condition of the corn instead of using his own corn picker. Swenson caused four rows of Bux-treated corn and four rows of Thimet-treated corn, all of equal length, to be combined. Due to an oversight of the combine operator a portion of the Thimet corn was included in the Bux sample, thus enhancing the Bux corn sample in a yield comparison. Each sample was brought to the Corson Elevator and separate weight tickets were issued. On the basis of these Plaintiff calculated the difference in the yield between the damaged and the undamaged corn to be 14.74 bushels per acre, the Bux corn being the smaller of the two yields.

Plaintiff commenced an action against Chevron Chemical Company at Sioux Falls, June 1, 1973. A jury trial was held in March of 1974 on the issues of strict liability and express warranty. When Plaintiff rested the trial judge directed a verdict for the defendant on the issue of strict liability. The jury returned a verdict in the amount of $4,250 and judgment was entered thereon. From that verdict Defendant appeals and on the question of strict liability Plaintiff cross appeals. Because we affirm the decision of the trial court on the issue of express

warranty we find no need to deal with the cross appeal on strict liability.

Appellant charges that (a) the breach of express warranty theory is insupportable, (b) there was insufficient evidence of damage, (c) there were errors in the instructions to the jury and (d) there were evidentiary errors.

## EXPRESS WARRANTY

Our state law on the creation of express warranties is set out in SDCL 57-4-25 through 57-4-29. SDCL 57-4-26 provides that:

"Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

SDCL 57-4-29 provides that:

"It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

We turn now to the pertinent parts of the labeling of the bags containing the Ortho Bux Ten. One such bag was introduced into evidence at the trial and it bears the following information, all in very readable large heavy type. On one side is found:

"Chevron Ortho Bux Ten Granular for control of corn rootworm larvae (insecticide)".

On the reverse side there are directions for application, cautions relating to the danger of swallowing the contents and then the following:

"CONDITIONS OF SALE: 1. Chevron Chemical Company (Chevron) warrants that this material conforms to

the chemical description on the label and is reasonably fit for use as directed hereon. Chevron neither makes, nor authorizes any agent or representative to make, any other warranty of FITNESS or of MERCHANT-ABILITY, guarantee or representation, express or implied, concerning this material.

2. Critical and unforeseeable factors beyond Chevron's control prevent it from eliminating all risks in connection with the use of chemicals. Such risks include, but are not limited to, damage to plants and crops to which the material is applied, lack of complete control, and damage caused by drift to other plants or crops. Such risks occur even though the product is reasonably fit for the uses stated hereon and even though label directions are followed. Buyer and user acknowledge and assume all risks and liability (except those assumed by Chevron under 1 above) resulting from handling, storage, and use of this material."

■ Appellant argues that the only effective express warranty involved in this case is one that the insecticide will conform to the label. Appellant refers, however, only to that portion of the label listing the chemical ingredients of the insecticide. We find that the label taken as a whole not only lists chemical ingredients but also promises to the potential buyer that the Ortho Bux Ten sack contains fifty pounds of a material which is an insecticide developed especially for the control of corn rootworm larvae. Contrary to what Appellant has argued, we do not find that such words as express the capacity of the chemicals for corn rootworm larvae control are mere words of opinion or puffery. In *California Chemical Company v. Lovett*, 1967, La.App., 204 So.2d 633, Judge Fruge, dissenting, questioned "whether or not public policy should permit the commercial enterprise to produce a product, advertise it, and place it on the market making representations that the product is designed to serve one particular purpose, and then totally avoid any and all responsibility on its part, should the product fail to be suitable for the purpose it was intended and represented to serve. * * * And even if it be said that the defendant intended only to [sic] purchase of the chemicals as specified on the containers them-

selves, nonetheless, it is unmistakable that his motive for purchasing those chemicals was to receive a product which would be effective as an insecticide, which motive was known to the other party; and the ineffectiveness of the chemical compound as an insecticide must be deemed as error in the motive or cause of the contract thereby invalidating the contract itself." We too are of the opinion that public policy should not allow a manufacturer to avoid responsibility for the ineffectiveness of a product which was offered, as in this case, for only one purpose, the effective control of corn rootworm larvae. An express warranty clearly exists and Appellant must be held to it.

## BREACH OF WARRANTY

Appellant next argues that even if an express warranty were found to exist, Respondent has not shown that there was a breach of this warranty on Appellant's part. Appellant claims that there is no showing of a defect in its product or of proximate cause, with regard to the loss of yield. We do not agree.

In order to recover money damages for a breach of express warranty one must prove:

"(1) an affirmation of fact or promise made by the seller to the buyer relating to the goods;

(2) such affirmation of fact or promise became a part of the basis of the bargain;

(3) that the injured party, in making the purchase, relied on the representations, affirmations of fact or promises;

(4) that the goods sold by the seller failed to comply with the promises or affirmations of fact made by the seller;

(5) that the buyer, because of such failure, was financially injured; and

(6) that such failure to comply was a proximate cause of the financial injury suffered by the buyer." *General Supply and Equipment Co., Inc. v. Phillips,* 1972, Tex.Civ.App., 490 S.W.2d 913.

We are satisfied that, based on our examination of the record, Respondent has fulfilled the foregoing conditions. On the issue of damage and proximate cause Respondent put on Dr. Kantack, a qualified expert witness, who testified that the corn was severely injured by corn rootworm. He went on to say that "[t]his was true of the fields we examined where he had used Bux. Now actually some were probably a little more severely injured than others, but they were all—more injured than what we considered economically acceptable." The testimony continues:

"MR. AHO: Did you observe any control of corn rootworm?

MR. NIMICK: Same objection.

THE COURT: Same ruling.

DR. KANTACK: If there was any control there I couldn't detect it.

MR. AHO: Did you observe any control of corn rootworm in the fields treated with the Thimet insecticide?

DR. KANTACK: This was in the one field, yes. Well, one field on the Merle Swenson farm treated with Thimet, yes."

■ It is true that other elements might have been responsible for similar damage and resulting loss of yield. In view of the testimony offered at trial, however, it is entirely possible that a jury could find that the ·corn had been damaged by corn rootworm, that this damage had harmed Respondent economically, and that Appellant's product had failed to comply with the express warranty thus resulting in the harm complained of. This Court, in *Engberg v. Ford Motor Company,* 1973, 87 S.D. 196, 205 N.W.2d 104, on the issue of proximate cause stated:

"The standard to be applied in determining whether or not a party has met his burden of proof on the issue of causation is set forth in *Parham v. Dell Rapids Township*, 1963, 80 S.D. 281, 122 N.W.2d 548. Pursuant to Parham, a plaintiff has met his burden of proof on the issue of causation when the evidence is sufficient for the jury to reasonably conclude, without resort to speculation, that the preponderance favors liability. As such, the plaintiff is not required to prove his case to a degree of absolute certainty."

We are convinced that Respondent has met his burden of proof.

## DAMAGES

 Defendant has objected to the award of damages inasmuch as it contends that the yield loss was speculative and that Plaintiff was not entitled to reimbursement for the defective insecticide. It is indeed true that we have earlier said "the rule in this state [is] that the matter of measuring damages may not be left to mere speculation on the part of the jury. Facts must exist and be shown by the evidence which afford a basis for measuring the loss of the plaintiff with reasonable certainty." *Kressly v. Theberge*, 79 S.D. 386, 112 N.W.2d 232. We believe Plaintiff has succeeded in doing this to the required degree. We do not, in this type of situation, demand the impossible. It is well stated that

"Damages are not rendered uncertain because they cannot be calculated with absolute exactness or because the consequences of the wrong are not precisely definite in pecuniary amount. An element of uncertainty in the amount of damages or the fact that they cannot be calculated with mathematical accuracy or with absolute certainty or exactness is not a bar to recovery. Nor is mere difficulty in the assessment of damages a sufficient reason for refusing them where the right to them has been established." 22 Am.Jur.2d, Damages, § 23, p. 42.

While the comparison between the Thimet corn and the Bux corn could have been more accurate since some Bux corn was inadvertently mixed with the Thimet corn, this would surely have

increased the damages, not diminished them and Appellant can hardly be heard to make such an objection. The method of ascertaining damages for crop injury, under the rule that the measure of damages is the difference between the value of the crop immediately before and immediately after the injury, is to take the value at maturity which the probable crop would have had but for the injury, deduct the value which the injured crop actually had at maturity, and deduct further any reduction in amount and value of labor and expense attributable to the reduced yield. Where the reduction in yield by reason of injury does not result in any reduction in labor and expense of maturing, caring for, and marketing the crop, the damages are ascertained by simply deducting from the market value which the probable crop would have had at maturity, the market value at maturity of the crop actually produced. 21 Am.Jur.2d, Crops, § 79, p. 665. This, in effect, is what has been done here.

■ Plaintiff sought recovery of the $717 paid for the purchase of 2100 pounds of Defendant's defective product. SDCL 57-8-37 states that

> "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."

If the insecticide had been as warranted, it would apparently have been worth $717. In its defective condition it cost Plaintiff a considerable sum and must for practical purposes have been deemed by the jury to have been worth nothing. This conclusion is not unreasonable under the circumstances.

## INSTRUCTIONS AND EVIDENCE

We have examined Defendant's other allegations regarding erroneous jury instructions and improperly admitted evidence and find them to be without merit. The judgment of the trial court is therefore affirmed.

DUNN, C. J., and WOLLMAN and DOYLE, JJ., concur.

COLER, J., concurs specially.

COLER, Justice (concurring specially).

I agree with the result the majority opinion has reached but cannot, in good conscience, accept the public policy statement taken from the dissent of Judge Fruge in *California Chemical Company v. Lovett,* 1967, La.App., 204 So.2d 633, as controlling. That decision involved an exclusion or waiver of a warranty, an issue not before us in this case.

The Louisiana statutes cited by the majority opinion in *California Chemical Company v. Lovett,* supra, appear to be a carryover from the Napoleonic code. See *Wisdom Moving & Storage v. Louisiana Public Service Commission,* 1960, 240 La. 188, 121 So.2d 739; LSA—C.C. arts. 1764, 1901, 2520, 2541, 2542. It was well after both of the above cited cases, by Act No. 92 of Acts of the Legislature of the State of Louisiana, Regular Session of 1974, that any part of the Uniform Commercial Code found its way into Louisiana statutes and Article 2 of the U.C.C. entitled "Sales" was entirely omitted therefrom. In South Dakota, on the other hand, the entire Uniform Commercial Code, with only minor variations, has been adopted.

The statutes cited by the majority opinion, all a part of the Uniform Commercial Code SDCL 57-4-25 through 57-4-29, adequately express the legislative policy of this state and SDCL 57-4-33 et seq., sufficiently cover the subject matter of exclusion from or limitations on express or implied warranties of fitness to make the citation unnecessary and undesirable.