2002 SD 135

George BUNKERS and Gwen Bunkers
d/b/a George Bunkers Construction,
Plaintiffs and Appellants,

v.

Gary JACOBSON and Diane Jacobson,
Defendants and Appellees.

and

George Bunkers and Gwen Bunkers
d/b/a George Bunkers Construction,
Third Party Plaintiffs and Appellants,

v.

Naatjes Concrete, Inc. and D.L. Johnson
and Gordon Johnson d/b/a Johnson
Drywall, Third Party Defendants.

Nos. 21965, 22021.

Supreme Court of South Dakota.

Considered on Briefs April 23, 2002.

Decided Nov. 6, 2002.

Timothy A. Clausen of Klass, Stoick, Mugan, Villone, Phillips, Orzechowski, Clausen & Lapeirre, Sioux City, IA, Kristi Holm of Davenport, Evans, Hurwitz & Smith, Sioux Falls, SD, for plaintiffs and appellants and third-party plaintiffs and appellants.

Jeffrey J. Koerselman and Gary P. Thimsen of Woods, Fuller, Shultz & Smith, Sioux Falls, SD, for defendants and appellees.

TRANDAHL, Circuit Judge.

[¶ 1.] George and Gwen Bunkers, doing business as George Bunkers Construction (Bunkers Construction), appeal the trial court's decision awarding damages in favor of Gary and Diane Jacobson (Jacobson) in a cost-plus contract dispute. By notice of review, Jacobson asserts that the trial court erred in failing to award prejudgment interest on a counterclaim. We affirm in part, reverse in part and remand.

## PROCEDURAL HISTORY

[¶ 2.] Bunkers Construction initiated suit against Jacobson for profit and overhead due and owing under a residential construction contract. Jacobson counterclaimed for breach of contract and negligent construction. Bunkers Construction subsequently filed a third party complaint for indemnification and contribution from several subcontractors including Naatjes Concrete, Inc. The Bunkers Construction claim and the Jacobson counterclaim were bifurcated.

[¶ 3.] By agreement of all parties, the Bunkers Construction claim was submitted on stipulated facts. The counterclaim, however, was tried before the court. In

its judgment, the trial court dismissed the Bunkers Construction claim in its entirety and awarded $64,834.93 in damages to Jacobson on the counterclaim. Further, the court found that Bunkers Construction could recover $8,026.68 on its third-party claim against Naatjes Concrete, Inc[1]. The trial court also denied Jacobson's request for prejudgment interest. Bunkers Construction appealed and Jacobson filed a notice of review.

## FACTS

[¶ 4.] This dispute revolves around a contract for the construction of a home in the Prairie Tree Addition of Sioux Falls, South Dakota. In 1991, Jacobson decided to build a new home in Sioux Falls. Bids were solicited with the assistance of Gary Stanley, an architect hired by Jacobson. Eventually, Bunkers Construction was hired to construct the home and the parties entered into a cost-plus contract.[2] George Bunkers is a long-time residential contractor in the Sioux Falls area. The Bunkers lived immediately next door to Jacobson's lot. George Bunkers had his office there and his sole construction trailer was on the Jacobson property.

[¶ 5.] Pertinent parts of the contract are important in this dispute. The contract provided for compensation to Bunkers Construction as follows:

> 17. CONTRACT SUM. The Contract Sum shall be the actual cost of all labor, materials, permits and equipment on site and employed in the construction as of the date of payment, plus 3% overhead, 6% profit on the first $300,000.00;

---

1. Naatjes Concrete, Inc. did not appeal this judgment.

2. In the building industry, a "cost-plus contract" provides no financial incentive for the contractor to cut corners on the building project or to use anything less than the best and, presumably, the most costly materials.

5% profit on any amounts over $300,000.00.

Further, under costs to be reimbursed, the contract defined the "cost of work" as "costs necessarily incurred by the Contractor in the proper performance of the Work."

[¶ 6.] The contract also allowed the owner, Jacobson, to purchase material as follows:

18. PURCHASE OF MATERIALS—DISCOUNTS, REBATES AND REFUNDS. Owner may at his option purchase directly any of the materials or supplies necessary in the construction of the residence. No percentage mark-up on appliances, electric switch gear, light fixtures, window treatments and carpeting.

[¶ 7.] Moreover, the contract required Bunkers Construction to build the house according to architectural plans. Specifically, the contract stated:

2. WORK. The Work will be completed in accordance with the Construction Drawings and Plans made by Randall Stanley Architects.... The Plans are incorporated in this contract. The Owner will provide Contractor with all architects' drawings and explanations as required to indicate the work to be done. The Contractor will follow these drawings as interpreted by the Architect.

* * *

21. CONTRACT DOCUMENTS. All plans, drawings, specifications, change orders and other documents prepared by Architect shall become a part of this Contract.

* * *

23. PLANS AND SPECIFICATIONS. Contractor agrees to follow the specifications, plans and drawings and that the work will be successfully executed in accordance with them, without any additional or extra work other than such as is necessarily implied, or to be inferred from the specifications, plans and drawings, upon a fair and liberal construction.

Jacobson never provided any official specifications or drawings. The only drawing available to Bunkers Construction was one marked "Not For Construction." [3]

[¶ 8.] Bunkers Construction began building the house in July 1991 and problems began to surface. During the course of construction, Jacobson purchased certain items for the house. It was the purchase of these items that initiated this dispute. Bunkers Construction claims that, because of the express terms of the contract, it is owed profit and overhead along with reimbursement for the cost of the excise tax on the "owner-purchased" items. Jacobson disputes this.

[¶ 9.] The construction of the home was essentially completed in July 1992. Jacobson claims that Bunkers Construction breached the contract because of defective work performed. The defects can be classified into three main areas: roofing, water problems and drywall. Despite complaints to Bunkers Construction and some attempts by Bunkers to repair these problems, they persisted. Jacobson then hired other contractors to attempt to correct the problems. Jacobson is also asking for prejudgment interest.

## ISSUES

[¶ 10.] Whether Bunkers Construction is entitled to profit and overhead on owner-purchased items under the contract.

3. This drawing was not made a part of the record.

Whether Bunkers Construction is entitled to recover excise tax already paid on owner-purchased items.

Whether Bunkers Construction is responsible for damages resulting from certain defects on the house.

Whether Jacobson is entitled to prejudgment interest.

## STANDARD OF REVIEW

[¶ 11.] Interpretation and construction of a contract is reviewed de novo. *Mahan v. Avera St. Luke's*, 2001 SD 9, ¶ 15, 621 N.W.2d 150, 154. The claim of Bunkers Construction was submitted to the trial court by stipulated facts. When evidence is offered by way of stipulated facts, "we are free to determine the facts as if presented here for the first time unaided by any deference to the trial court." *Muhlenkort v. Union County Land Trust*, 530 N.W.2d 658, 660 (S.D. 1995) (citations omitted).

[¶ 12.] Jacobson's counterclaim was tried before the court. A trial court's findings of fact are reviewed under the clearly erroneous standard. *Arnold Murray Constr., L.L.C. v. Hicks*, 2001 SD 7, ¶ 6, 621 N.W.2d 171, 174. In applying the clearly erroneous standard, this Court's function is not to decide factual issues de novo. The question is not whether this Court would have made the same findings that the trial court did, but whether on the entire evidence this Court is left with a definite and firm conviction that a mistake has been made. *People in Interest of H.M.*, 474 N.W.2d 267, 269 (S.D.1991); *Maryhouse, Inc. v. Hamilton*, 473 N.W.2d 472, 474 (S.D.1991). Due regard shall be given to the opportunity the trial court had to judge the credibility of witnesses. *State By and Through DOT v. Garvin*, 456 N.W.2d 779, 781 (S.D.1990); *Masek v. Masek*, 89 S.D. 62, 66, 228 N.W.2d 334, 336 (1975); *Century 21 Associated Realty v. Hoffman*, 503 N.W.2d 861, 864 (S.D.1993). This Court overturns a trial court's conclusions of law only when the trial court erred as a matter of law. *Dougherty v. Dougherty*, 482 N.W.2d 320, 322 (S.D.1992); *Jankord v. Jankord*, 368 N.W.2d 571, 572 (S.D.1985).

## DECISION

### ISSUE ONE

[¶ 13.] **Bunkers Construction is entitled to profit and overhead on owner-purchased items under the contract.**

[¶ 14.] The parties dispute whether Bunkers Construction is entitled to profit and overhead on items specifically purchased by Jacobson. Bunkers Construction asserts that the contract explicitly allows for profit and overhead to be charged on owner-purchased items. Specifically, it claims that when construing Paragraphs 17 and 18 of the contract together, it is entitled to overhead and profit on all items except those specifically enumerated in Paragraph 18. The owner-purchased items Bunkers Construction is seeking compensation for are not listed as an exclusion in Paragraph 18.[4]

---

4. Owner-purchased items Bunkers Construction is seeking profit and overhead on are:

| | |
|---|---|
| 1. Dakota Floors (wood floors) | $18,000.00 |
| 2. Egger Steel Company | 688.04 |
| 3. Krier & Blain, Inc. | 176.18 |
| 4. Landscape Garden Centers | 5,369.48 |
| 5. Malloy Electric (electric wiring) | 34,295.65 |
| 6. Moses Painting | 25,000.00 |
| 7. Schoenhard's Custom Cabinets & Woodworking | 31,693.48 |
| 8. SieMatic Kitchen Interior Design (kitchen cabinets) | 42,930.00 |

[¶ 15.] It is well settled that " 'in determining the proper interpretation of a contract the court must seek to ascertain and give effect to the intention of the parties.' " *Read v. McKennan Hosp.*, 2000 SD 66, ¶ 23, 610 N.W.2d 782, 786 (quoting *Malcolm v. Malcolm*, 365 N.W.2d 863, 865 (S.D.1985)). *Accord Kimball Investment Land, Ltd. v. Chmela*, 2000 SD 6, ¶ 14, 604 N.W.2d 289, 293. The Court ascribes to contract terms " 'their plain and ordinary meaning.' " *Harms v. Northland Ford Dealers*, 1999 SD 143, ¶ 12, 602 N.W.2d 58, 61 (quoting *Economic Aero Club, Inc. v. Avemco Ins. Co.*, 540 N.W.2d 644, 645 (S.D.1995)). " 'The court is to enforce and give effect to the unambiguous language and terms of the contract[.]' " *Kimball Investment Land, Ltd.*, 2000 SD 6 at ¶ 10, 604 N.W.2d at 292 (quoting *Campion v. Parkview Apartments*, 1999 SD 10, ¶ 25, 588 N.W.2d 897, 902). *Accord Cotton v. Manning*, 1999 SD 128, ¶ 15, 600 N.W.2d 585, 588. Whether the language of a contract is ambiguous is a question of law. *Pesicka v. Pesicka*, 2000 SD 137, ¶ 6, 618 N.W.2d 725, 726. Ambiguity exists " 'when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.' " *Divich v. Divich*, 2002 SD 24, ¶ 10, 640 N.W.2d 758, 761 (quoting *Singpiel v. Morris*, 1998 SD 86, ¶ 16, 582 N.W.2d 715, 719).

> Conventional principles of contract interpretation require agreements to be construed in their entirety giving contextual meaning to each term. When provisions conflict, however, and full weight cannot be given to each, "the more specific clauses are deemed to reflect the parties' intentions—a specific provision controls a general one."

*AFSCME v. Sioux Falls School Dist.*, 2000 SD 20, ¶ 8, 605 N.W.2d 811, 813–814 (quoting *State v. Greger*, 1997 SD 14, ¶ 21, 559 N.W.2d 854, 864 (citing *Bock v. Perkins*, 139 U.S. 628, 634, 11 S.Ct. 677, 679, 35 L.Ed. 314, 316 (1891))).

[¶ 16.] The two provisions of the contract that are relevant to this issue, Paragraphs 17 and 18, are not ambiguous. They clearly provide that Bunkers Construction is entitled to a "percentage mark-up" for profit and overhead on all items, including those purchased by Jacobson, except those items specifically excluded in Paragraph 18. The "percentage mark-up" is at the rate of three percent overhead and six percent profit on the first $300,000, then five percent profit on any amount above $300,000.

[¶ 17.] This Court holds that Bunkers Construction is entitled to the percentage mark-up for profits and overhead on all items purchased by Jacobson except the appliances, electric switch gear, light fixtures, window treatments, and carpeting. Jacobson asserts that some of the items and services Bunkers Construction has itemized were purchased after the completion of their home or were items not contemplated in the contract. There is no provision in the contract that allows Bunkers Construction to receive compensation

| | |
|---|---|
| 9. Viking Glass | 5,193.65 |
| 10. Watertown Memorials (granite countertops) | 10,653.00 |
| 11. Vault Door (no invoice) | 500.00 |
| 12. Midwest Alarm (security system) | 4,904.10 |
| 13. Adams/Vital Acoustics (sound system) | 17,008.50 |
| 14. Bill's Sprinklers | 7,000.00 |
| 15. Dave Putzke Well Drilling and Repair, Inc. | 14,850.86 |
| 16. Splash City | 6,148.00 |

for items and services purchased after the completion of the home or not contemplated by the contract. Since the trial court did not make specific findings as to each of the sixteen items for which Bunkers Construction claims compensation, this Court cannot make a determination as to the amount owed by Jacobson under the contract.

[¶ 18.] The judgment is reversed as to this issue and this matter is remanded for a determination of the profit and overhead owed to Bunkers Construction pursuant to the contract.

## ISSUE TWO

[¶ 19.] **Bunkers Construction is not entitled to recover excise tax already paid on owner-purchased items.**

[¶ 20.] SDCL 10–46A is the law governing excise tax. Bunkers Construction claims it incurred an out-of-pocket expense of $5,341.28 for excise tax paid on owner-purchased items. Bunkers Construction claims that the excise tax is an "actual cost" incurred in the construction of the home and, therefore, it is entitled to reimbursement from Jacobson.

[¶ 21.] SDCL 10–46A–1 states, "There is imposed an excise tax upon the gross receipts of all prime contractors engaged in realty improvement contracts, at the rate of two percent." "Gross receipts" is defined as:

> the amount received directly or indirectly in money, credits, property or other money's worth *in consideration of the performance of realty improvement contracts* within this state, without any deduction on account of the cost of the property sold, the cost of materials used, the cost of services or labor purchased, amounts paid for interest or discounts or any other expenses whatsoever, nor may any deduction be allowed for losses. Gross receipts include those materials furnished to the prime contractor or subcontractor by the owner or the lessee of the realty improvement. For the purposes of measuring the tax imposed by this chapter, *gross receipts include* the greater of the cost or fair market value of *materials used by a contractor or subcontractor in the performance of a contract* regardless of whether the contractor or subcontractor owns or furnishes the materials. (emphasis added).

SDCL 10–46A–4.

[¶ 22.] The trial court denied Bunkers Construction's claim for reimbursement of the excise tax. Rather, it held that it should not determine the issue and that it was a decision for the Department of Revenue. We do not agree that this is a decision for the Department of Revenue.

[¶ 23.] Bunkers Construction alleges the contract provides that Jacobson is to pay "the actual cost of all labor, materials, permits and equipment on site and employed in the construction." However, the contract does not require Jacobson to pay the excise tax. Accordingly, we affirm the trial court on this issue, but for different reasons. " 'Where a judgment is correct, this court will not reverse although it was based on incorrect reasons or erroneous conclusions.' " *Poindexter v. Hand County*, 1997 SD 71, ¶ 16, 565 N.W.2d 86, 91 (quoting *Wolff v. Secretary, SD Game, Fish & Parks Dep't*, 1996 SD 23, ¶ 50, 544 N.W.2d 531, 540) (Sabers, J., dissenting). *See also Sommervold v. Grevlos*, 518 N.W.2d 733, 740 (S.D.1994) ("[A] trial court may still be upheld if it reached the right result for the wrong reason.").

## ISSUE THREE

[¶ 24.] **Bunkers Construction is responsible for damages resulting from**

**certain defects on the house, but not others.**

■ [¶ 25.] Jacobson discovered several defects in the construction of the house. The defects included roof problems, water problems and drywall problems.[5] Jacobson argues that these problems give rise to a breach of contract because the work performed was defective. Bunkers Construction claims that it was not defective work that gave rise to the problems, but defective design. Bunkers Construction claims that Jacobson breached the contract by failing to provide any plans or specifications drafted by Jacobson's architect. It is undisputed that the only plans Jacobson provided to Bunkers Construction were a set of drawings prepared by the architect marked "Not for Construction."

[¶ 26.] The trial court found that the defects in the construction of the house and the necessary costs of repairing or correcting the defects were the direct and proximate result of Bunkers' faulty work or failure to properly select and supervise competent subcontractors to perform work on the residence. This finding will not be overturned unless clearly erroneous. *Dougherty, supra; Jankord, supra.* The trial court concluded that the residence was constructed with numerous defects, all of which were due either to Bunkers' own negligence or substandard work or negligent failure to prudently select and supervise competent subcontractors. The trial court also concluded that, as a direct and proximate result of Bunkers Construction's negligence and poor workmanship, Jacobson was provided with a faulty resi-dence that required extensive repairs and that entitled Jacobson to compensation from Bunkers. These conclusions of law will not be overturned unless the trial court erred as a matter of law. *Dougherty, supra; Jankord, supra.*

■ [¶ 27.] A contractor owes a duty to a new homeowner.

As a general rule, it may be said that where a person holds himself out as especially qualified to perform work of a particular character there is an implied warranty that the work shall be done in a reasonably good and workmanlike manner and that the completed product or structure shall be reasonably fit for its intended purpose. 17A C.J.S. *Contracts* § 329.

*Waggoner v. Midwestern Development, Inc.,* 83 S.D. 57, 64, 154 N.W.2d 803, 807 (1967). The principle behind this is to discourage sloppy building by contractors. *Id.* (quoting Williston on Contracts, 3d ed., § 926A). South Dakota case law purports:

that where in the sale of a new house the vendor is also a builder of houses for sale there is an implied warranty of reasonable workmanship and habitability surviving the delivery of deed. The builder is not required to construct a perfect house and in determining whether a house is defective the test is reasonableness and not perfection. *Schipper v. Levitt & Sons, Inc.,* [44 N.J. 70, 207 A.2d 314 (1965)]. The duration of liability is likewise determined by the standard of reasonableness.

*Waggoner,* 83 S.D. at 68, 154 N.W.2d at 809.

---

5. Jacobson also alleges that Bunkers Construction breached the contract by failing to be at the job site for 75 percent of the total project time. Jacobson claims that Bunkers personally agreed to oversee the construction of the house and to be at the job site more than 75 percent of the total construction time. However, the trial court properly found that, since the written contract did not require Bunkers to spend any specific time at the construction site, there was no breach of contract.

## Roof Problems

[¶ 28.] After the presentation of evidence, the trial court found that the defect in the use of a ridge vent was the direct and proximate result of Bunkers Construction's faulty work or failure to properly select and supervise competent subcontractors performing work on the residence. The trial court found the reasonable value to repair the damage to the roof was $12,870.[6]

[¶ 29.] The trial court found that defects in the roof resulted in snow accumulation in the attic of the garage and living quarters due to the leaky roof and the inappropriate use and installation of a ridge vent. There were some additional minor problems with the shake shingle installation. Those problems were cosmetic in nature and there was no leaking that Jacobson's expert attributed to improperly installed shingles. During construction of the home, a ridge vent was placed on a shake roof. It is undisputed that this type of vent allowed moisture to enter into the residence resulting in damage. It is undisputed that ridge venting is not designed to be used with shake shingles. It is also undisputed that Gary Stanley, the architect, approved the use of galvanized aluminum ridge venting and galvanized steel valleys.

> [A] construction contractor who has followed plans or specifications furnished by the contractee, his architect, or engineer, and which have proved to be defective or insufficient, will not be responsible to the contractee for loss or damage which results ... solely from the defective or insufficient plans or specifications, in the absence of any negligence on the contractor's part, or any express

warranty by him as to their being sufficient or free from defects.

*Reif v. Smith*, 319 N.W.2d 815, 818 (S.D. 1982) (quoting Annot., 6 ALR3d 1394, 1397).

[¶ 30.] Jacobson's own experts testified that ridge venting is not designed to be used with shake shingles. Since the improper use of ridge venting was the cause of the roof problems and it was approved by the architect, this Court holds that the trial court's conclusion that the defects in the roof were the direct and proximate result of Bunkers Construction's faulty work is clearly erroneous. *Dougherty, supra; Jankord, supra.* Under the terms of the contract, Bunkers Construction was contractually bound to and did follow the architect's approval of the improper ridge venting. Therefore, the trial court erred as a matter of law and the damage award to Jacobson for the repairs to the roof is reversed.

## Foundation Water Problems

[¶ 31.] Based upon the evidence presented at trial, the trial court held that the water infiltration problems having to do with the basement walls were attributable to Bunkers Construction. The trial court specifically found the problems were caused by improper compaction of the backfill around the outside of the basement foundation and incomplete or improper installation of drain tile. The trial court awarded $35,911.58 as a reasonable value to repair the water problems. It is well settled in this state that a trial court's findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity the trial court had to judge the credibility of the witnesses. SDCL 15–65–2(a); *Masek*, 89

---

**6.** There was a separate claim for shingling problems for which Bunkers Construction admitted liability. The $500 admitted liability claim for shingling is not part of the $12,870 awarded for the problems caused by the ridge vent.

S.D. at 66, 228 N.W.2d at 336; *Brown County v. Meidinger*, 271 N.W.2d 15, 18 (S.D.1978).

[¶ 32.] After moving into the house, Jacobson experienced water problems in the basement. Specifically, water accumulated near the vault area and around pipes that were installed in the walls. Jacobson alleges the water problems were caused by improperly installed drain tile, improperly sealed foundation walls, moisture penetration and drainage problems due to improper compaction of the foundation walls and the garage floor and honeycombing in the concrete. Jacobson's expert testified that the water damage was caused by improper drainage, honeycombing in the concrete, plugged and non-existent drain tile.

[¶ 33.] Using the same analysis as this Court did with the drywall problems, it is undisputed that the lack of drain tile is the result of insufficient plans being provided by Jacobson or his architect. Jacobson concedes that he did not provide any plans or specifications showing that drain tile should be installed. Further, the evidence indicates that in addition to the lack of drain tile, the other proximate cause of the leakage in the foundation is the landscape work. Jacobson had the soil tested by Twin City Testing prior to construction. The soil test recommendations were that the final grade slope away from the building at one-inch drop for every foot, that no automatic sprinkler system be used within five feet of the structure, and that the area adjacent to the foundation be kept free of trees and shrubs. Jacobson had $45,000 worth of landscaping done to his property on June 23 and 24, 1992. It is undisputed that the first time Jacobson had water in his basement was on June 29, 1992. While Bunkers Construction did the basic dirt work, when they finished the slope was away from the foundation and according to Twin City Testing's grade

recommendation. When the grading around the perimeter of the home was inspected in 1996, it was sloping towards the house. Jacobson also admitted that they hired, controlled and directed the post construction landscaper. The certified engineer testified that the landscaper altered the terrain in such a manner as to cause the problems with the leaks. The landscaping included berms, trees, shrubs and plants all planted adjacent to the foundation and the sprinkler system was installed with heads against the foundation. It is clear from the evidence that the landscaping work approved by Jacobson did not comply with the recommendations of Twin City Testing.

[¶ 34.] This Court holds that the trial court's conclusion that the defects in the foundation caused by the lack or insufficient use of drain tile were the direct and proximate result of Bunkers Construction's faulty work is clearly erroneous. *Dougherty, supra; Jankord, supra.* Under the terms of the contract, Bunkers Construction was contractually bound to follow construction drawings and plans made by Jacobson's architect. There were no architect plans provided by Jacobson, and the plans marked "Not for Construction" did not include drain tile. These plans did not include drain tile. It is apparent from the evidence that the water problems were caused by the lack of drain tile and the landscaping work done by the landscaper as approved by Jacobson. We reverse the trial court's award of damages to Jacobson in the amount of $35,911.58 for the repair of the water damage.

*Drywall Problems*

[¶ 35.] After presentation of the evidence, the trial court found that the defects in the drywall and the necessary repair costs were the direct and proximate result of Bunkers Construction's faulty

work or failure to property select and supervise competent subcontractors performing work on the residence. Specifically, the trial court found that there was defective sheet rocking which allowed excessive splitting and cracking requiring repair and repainting. The trial court awarded the sum of $6,732.00 for drywall repairs and $9,321.35 for painting for a total of $16,053.35.[7]

[¶ 36.] Bunkers Construction hired the subcontractor who installed the sheetrock walls throughout the Jacobson home. Jacobson had problems with the drywall splitting and cracking. The trial court heard evidence that Jacobson was forced to hire another contractor to replace sheetrock in almost every room in the house. The contractor testified that the number of cracks in the sheetrock was "excessive."

[¶ 37.] Jacobson's expert testified that twenty-five percent of the water damage came from the improper installation of the ridge vent on the roof. Given this Court's decision regarding the roof, the trial court's award of damages for the drywall and painting shall be reduced by twenty-five percent. Jacobson's expert also testified that an additional twenty-five percent of the drywall problems could not be ascertained or allocated to any cause as they were "iffy and unknown." Given the expert testimony on this issue, we are left with a definite and firm conviction that a mistake has been made. *Arnold Murray Const., LLC v. Hicks, supra.* The damage award of $16,053.35 for the drywall problem must be deducted by a total of fifty percent, twenty-five percent caused by the roof and an additional twenty-five percent because the cause was "iffy and unknown."

[¶ 38.] Bunkers Construction argues that the trial court should have allowed for depreciation and reduced the award of damages on the paint repair based on the life expectancy of the paint. Jacobson repainted the entire interior of the residence after the sheetrock was repaired. The paint in the Jacobson house, at that time, was six years old.

[¶ 39.] SDCL 21–2–1 sets the measure of damages for a breach of contract as follows:

> For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is *the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.* No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin. (emphasis added).

In order to award contract damages there must be evidence that the damages were in fact caused by the breach. *See Bad Wound v. Lakota Community Homes, Inc.,* 1999 SD 165, ¶ 9, 603 N.W.2d 723, 725 (in action for breach of contract, plaintiff is entitled to recover all detriment proximately caused by breach).

[¶ 40.] "Proof of damages requires a reasonable relationship between the method used to calculate damages and the amount claimed." *McKie v. Huntley,* 2000 SD 160, ¶ 18, 620 N.W.2d 599, 603 (citing *Swenson v. Chevron Chemical Co.,* 89 S.D. 497, 234 N.W.2d 38, 43 (1975)). In applying this rule, a reasonable certainty test is employed. "Reasonable certainty requires proof of a rational basis for measuring loss," without allowing any room for speculation. *McKie,* 2000 SD 160 at ¶ 18,

---

7. The trial court also allowed Bunkers to collect $8,026.68 of the $16,035.53 on a cross- claim against Naatjes Concrete, Inc., the subcontractor who did the actual drywalling.

620 N.W.2d at 603 (citing *Drier v. Perfection, Inc.*, 259 N.W.2d 496, 506 (S.D.1977)) (quoting *Kressly v. Theberge*, 79 S.D. 386, 112 N.W.2d 232, 233 (1961) (citations omitted)).

[¶ 41.] Bunkers Construction is not entitled to a reduction of the damage award on the paint for depreciation. Jacobson is not required to absorb the cost of repainting the house since the defects in the sheetrocking were the direct and proximate result of Bunkers Construction's faulty work or failure to properly select and supervise competent subcontractors performing the work. The only reason Jacobson repainted the interior of the house was the repair of the drywall.

## ISSUE FOUR

[¶ 42.] **Jacobson is entitled to prejudgment interest.**

[¶ 43.] Jacobson claims the trial court erred in not awarding prejudgment interest. Jacobson asks this Court to award prejudgment interest under SDCL 54–3–5 or, alternatively, under SDCL 21–1–13.1. Prejudgment interest for damages arising from a contract is allowed by SDCL 21–1–13.1. *See U.S. Lumber, Inc. v. Fisher*, 523 N.W.2d 87, 90–91 (S.D.1994).

[¶ 44.] Under SDCL 21–1–13.1:

Any person who is entitled to recover damages, whether in the principal action or by counterclaim, cross claim or third-party claim, is entitled to recover interest thereon from the day that the loss or damage occurred, except during such time as the debtor is prevented by law, or by act of the creditor, from paying the debt. Prejudgment interest is not recoverable on future damages, punitive damages or intangible damages such as pain and suffering, emotional distress, loss of consortium, injury to credit, reputation or financial standing, loss of enjoyment of life or loss of society and companionship. If there is a question of fact as to when the loss or damage occurred, prejudgment interest shall commence on the date specified in the verdict or decision and shall run to, and include, the date of the verdict or, if there is no verdict, the date the judgment is entered. If necessary, special interrogatories shall be submitted to the jury. Prejudgment interest on damages arising from a contract shall be at the contract rate, if so provided in the contract; otherwise, if prejudgment interest is awarded, it shall be at the Category B rate specified in § 54–3–16. The court shall compute and award the interest provided in this section and shall include such interest in the judgment in the same manner as it taxes costs.

"Prejudgment interest is now mandatory, not discretionary." *Alvine v. Mercedes–Benz of North America*, 2001 SD 3, ¶ 29, 620 N.W.2d 608, 614. Prejudgment interest is allowed from " 'the day that the loss or damage occurred.' " *Fritzel v. Roy Johnson Const.*, 1999 SD 59, 594 N.W.2d 336, 339(quoting SDCL 21–1–13.1).

[¶ 45.] Following a hearing, the trial court denied prejudgment interest. It is apparent that the damages for breach of contract are allowed from the day that the loss or damage occurred until the date the final judgment was entered. The trial court, however, made no findings of fact or conclusions of law consistent with its order denying prejudgment interest. Under the facts and circumstances of this case, the law is clear that Jacobson is entitled to prejudgment interest under SDCL 21–1–13.1. It is our decision to reverse and remand the issue of prejudgment interest back to the trial court for determination of the amount of prejudgment interest owed to Jacobson.

CONCLUSION

[¶ 46.] We affirm in part, reverse in part, and remand for further proceedings consistent with this decision.

[¶ 47.] GILBERTSON, Chief Justice, and KONENKAMP and ZINTER, Justices, and AMUNDSON, Retired Justice, concur.

[¶ 48.] TRANDAHL, Circuit Judge, for SABERS, Justice, disqualified.