#24517-aff in pt, rev in pt & rem-RWS

**2008 SD 16**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JAMES B. OSMAN,                                   Plaintiff and Appellee,

  v.

KARLEN AND ASSOCIATES AND
DEAN KARLEN,                                      Defendants.

and

GARY PETERSON,                                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JACK R. VON WALD
Judge

* * * *

ROBERT L. SPEARS of
Spears Law Office, P.C.
Watertown, South Dakota                           Attorneys for appellee.


KIMBERLY DORSETT of
Richards, Oliver & Dorsett
Aberdeen, South Dakota                            Attorneys for appellant.

* * * *

ARGUED JANUARY 9, 2008

OPINION FILED **03/05/08**

SABERS, Justice.

[¶1.] James Osman sued Dean Karlen, Karlen & Associates, Inc., and Gary Peterson alleging breach of contract and retaliatory discharge. After a bench trial, the circuit court found against Peterson on the breach of contract claim. The circuit court dismissed the retaliatory discharge claim and directed a verdict in favor of Karlen and Karlen & Associates, Inc. on the breach of contract claim. Peterson appeals.

## FACTS

[¶2.] Karlen is an insurance agent in Aberdeen, South Dakota. He formed Karlen & Associates, a South Dakota corporation doing business in South Dakota, to sell DakotaCare policies. Karlen is the President and only employee of this corporation. Karlen rents office space to five individual agents who work out of his office as independent contractors. These agents selling DakotaCare policies assign their commissions to Karlen & Associates, which pays the agents their commissions. Agents at Karlen & Associates now sell other lines of insurance, in addition to DakotaCare policies. It is unclear whether these commission checks are assigned to Karlen & Associates or if the checks go directly to the agents.

[¶3.] Karlen also is the general agent for Security Financial Life (n/k/a Assurity) insurance products. Karlen recruits and trains agents to work with him, but they are actually independent agents that contract directly with Security Financial. Karlen receives a 10% override from the new agent's sales of Security Financial products. Security Financial pays the commissions from sales of its products directly to the independent agents and not to Karlen & Associates.

#24517

[¶4.]        Karlen owns an office building in Aberdeen, with office space for up to five independent agents.  If the agents are at club level,[1] then the agent pays no additional money for rent or office supplies.  If the agents are not at club level, then $200 per month was deducted from the agent's commission assigned to Karlen & Associates.

[¶5.]        Osman was an insurance agent who worked out of Karlen's office building from 1990 to December 31, 1999.  In January of 2000, Osman became a detached agent and worked out of his home.  Peterson started working out of the office in 1996.

[¶6.]        Karlen drafted an "Agency Administrative Policy Manual" that sets forth some requirements of agents associated with his office.  Each agent received the manual upon hire.  The manual covered such items as when to be in the office, when to answer correspondence, how many appointments to schedule per day, and when to turn in activity sheets.  The manual also contains broad policy statements, such as "This Agency is a joint team effort.  By doing more than your share, you will receive more than average success."  It required brokerage business to be placed through the general agent, Karlen.

---

1.     Club level means the agent meets the sales goal set by the company.  Osman testified that club level was set around $17,000 of production.

-2-

[¶7.]        The relevant section for this case provides:

> 9.  Active [Full-Time (Club Level)][2] agents' policyholders are protected to the extent that they are not to be used by another agent as a prospecting list. The policyholder and his/her immediate family up to age 16 are protected. However, should another agent call on them by mistake, or not knowing they are a policyholder, and create some interest by the prospect, then both the original agent and the agent who created the need or interest should hold the interview and split the case.

The manual also explains the division of brokerage commissions. Generally, there is a 90/10, 80/20 or 50/50 split of commissions between the agent and Karlen & Associates, depending on the type of sale and the experience of the agent.[3]

---

2.     The words "Full-Time (Club Level)" are hand-written into the manual, which was offered as Exhibit 1 by Osman. Osman testified it was not in the copy he received in 1990. Karlen testified that he did not know when the words were added. The circuit court treated the policy as if those words did not exist.

3.     New Agents
  - First 2 years in the Insurance Business
  - Life (20% Agency/ 80% Agent)
  - Individual Health & D/I = 10% Agency, 90% Agent
  - Group = 50% Agency, 50% Agent (if General Agent involved in the sale) 20% Agency, 80% Agent (if General Agent is not involved in sale)
  - Annuities = 25% Agency, 75% Agent
  - DAKOTACARE = 50% Agency, 50% Agent (Groups of 10 employees and over) 20% Agency, 80% Agent (Groups under 10 employees)
  - Medicare, Long-term care 20% Agency, 80% Agent

NOTE: ABOVE PERCENTAGES WILL BE EVAULATED EACH YEAR. IF A PRODUCT IS NOT DISCUSSED ABOVE, THEN AGENT/AGENCY SPLITS MUST BE CLEARED BY THE GENERAL AGENT. ALSO, JOINT SECURITY MUTUAL WORK WITH GENERAL AGENT WILL BE SPLIT 20% AGENCY, 80% AGENT (IF NO SALES CONTACT WITH THE CLIENT) OR 50% AGENCY, 50% AGENT (IF GENERAL AGENT ASSISTS IN THE SALE TO THE CLIENT). THIS DOES NOT APPLY TO THE FIRST 6 MONTHS FOR NEW AGENTS.

ESTABLISHED AGENT: - Any agent with more that [sic] two years experience.
  - Brokerage Life – 10% Agency, 90% Agent

(continued . . .)

#24517

[¶8.]　　In 1991, Osman sold Dennis Hellwig a life insurance policy. A year later he sold Dennis' wife, Cherie, and Dennis' sons insurance policies. In 1994 or 1995, Osman sold the Hellwigs an executive bonus plan, which is a retirement plan. Over the years he received commissions from these policies and continued to service the policies when needed.

[¶9.]　　On or around June 10, 2006, Osman went to the Hellwig's business[4] to change beneficiaries on the retirement plan Osman previously sold to the Hellwigs. There, he discovered Peterson was in the process of selling the Hellwigs a GEAR program.[5] Osman asked Karlen to enforce the policy manual, which Osman alleged required Peterson and Karlen to let Osman assist in the sale of the GEAR program and split the commission.

[¶10.]　　A couple of days later, Karlen, Osman and Peterson had a meeting regarding the GEAR policy and Osman assisting in the sale. Peterson claimed the sale was already completed and Osman was not needed to help with the sale. Moreover, Peterson would not split the commission for the sale. Osman asked

---

(. . . continued)
- Individual Health & D/I = 10% Agency, 90% Agent
- Brokerage Annuities 20% Agency, 80% Agent
- Medicare, long-term care 10% Agency, 90% Agent
- Group Business = 20% Agency, 80% Agent (if no General Agent Assistance) 50% Agency, 50% Agent (if General Agent assists with sale).

4.　　Hellwigs own and operate Hub City Livestock Auction in Aberdeen, SD.

5.　　GEAR is a tax advantage life insurance product.

-4-

Karlen to "follow the policy" and force Peterson to split the commission. Karlen

claimed he did not have the power to force the commission split.

[¶11.] Osman did not sell GEAR policies, but went to one seminar about the product. Thereafter, Osman called on the Hellwigs and told them the GEAR policy was not fully approved by the IRS. The Hellwigs called Peterson to ask about Osman's statements and Peterson explained that one section of the GEAR policy has not been fully approved, but the section he sold the Hellwigs was approved. Osman was subsequently fired in November of 2000 by Security Financial.

[¶12.] Osman sued Karlen, Karlen & Associates and Peterson. He alleged section nine of the Agency Administrative Policy Manual created an implied contract and the defendants breached the contract by refusing to split the commission on the GEAR policy sale. He also sued Karlen and Karlen & Associates for retaliatory discharge.

[¶13.] A bench trial was held on February 22-23, 2007. After Osman presented his case, the defendants moved for a directed verdict. The circuit court granted the motion for a directed verdict on the retaliatory discharge claim finding Osman presented no evidence that termination "for cause" was required. With regard to the breach of contract claim, the circuit court denied the directed verdict motion.

[¶14.] At the conclusion of the trial, the circuit court judge found Peterson had breached an implied contract based on section nine of the Agency Administrative Policy Manual. He awarded Osman 40% of the $117,082 commission Peterson earned from the GEAR sale to the Hellwigs. Prejudgment

interest amounted to $19,405, for a total judgment of $66,237.80. The circuit court found in favor of Karlen and Karlen & Associates and dismissed all claims.

Peterson appeals and raises the following issues:

1.  Whether the circuit court erred in denying Peterson a directed verdict for the breach of contract claim.

2.  Whether the circuit court erred in finding that the manual created a contract between Osman and Peterson.

3.  Whether the circuit court erred when it failed to hold that plaintiff's claims in equity are barred by the doctrine of unclean hands.

4.  Whether the circuit court erred in holding that the commission should be split 60/40.

## STANDARD OF REVIEW

We review a trial court's consideration of a motion for directed verdict and judgment notwithstanding the verdict under the following standard:

A motion for a directed verdict under SDCL 15-6-50(a) questions the legal sufficiency of the evidence to sustain a verdict against the moving party. Upon such a motion, the trial court must determine whether there is any substantial evidence to sustain the action. The evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in his favor. If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate. The trial court's decisions and rulings on such motions are presumed correct and this Court will not seek reasons to reverse.

Martinmaas v. Engelmann, 2000 SD 85, ¶20, 612 NW2d 600, 606 (additional citations omitted). "Thus, we apply the abuse of discretion standard when reviewing the trial court's ruling." *Id.* (citing Bland v. Davison County, 1997 SD 92, ¶26, 566 NW2d 452, 460 (citing Treib v. Kern, 513 NW2d 908, 914 (SD 1994)).

[¶15.]　　　On an appeal from a bench trial:

> We review the circuit court's findings of fact under the
> clearly erroneous standard. Under this standard, we will
> only reverse when we "are left with a definite and firm
> conviction that a mistake has been made" after a
> thorough review of the evidence. We review conclusions
> of law under the de novo standard without deference to
> the circuit court.
>
> In applying the clearly erroneous standard, our function
> is not to decide factual issues de novo. The question is not
> whether this Court would have made the same findings
> that the trial court did, but whether on the entire
> evidence we are left with a definite and firm conviction
> that a mistake has been committed. This Court is not
> free to disturb the lower court's findings unless it is
> satisfied that they are contrary to a clear preponderance
> of the evidence. Doubts about whether the evidence
> supports the court's findings of fact are to be resolved in
> favor of the successful party's "version of the evidence and
> of all inferences fairly deducible therefrom which are
> favorable to the court's action."

Fin-Ag, Inc. v. Feldman Bros., 2007 SD 105, ¶19, 740 NW2d 857, 862-63 (additional citation omitted).

[¶16.]　　　**1.**　　**Whether the circuit court erred in denying Peterson a directed verdict for the breach of contract claim.**

[¶17.]　　　At the conclusion of Osman's case, Peterson[6] requested a directed verdict regarding both the contract and retaliatory discharge claim. The circuit court denied the motion for directed verdict. The court found there was sufficient evidence in the record for the trial to continue. It noted that the agency administration policy, specifically paragraph nine, supported Osman's allegations

---

6.　　Since the breach of contract claim against Karlen and Karlen & Associates
　　　was dismissed after trial and Osman did not appeal the dismissal, reference
<span style="float:right">(continued . . .)</span>

that the commissions from the GEAR policy sale to Hellwigs should have been split. There was evidence that this commission splitting was company policy, based on the agency administration policy manual and other agents' testimony. Every agent receives a copy of the manual upon hire. Peterson was aware of the policy and the policy was in effect at the time of the GEAR sale.

[¶18.] Based on the record, there was sufficient evidence to deny the directed verdict motion. Therefore, the circuit court did not abuse its discretion.

[¶19.] **2. Whether the circuit court erred in finding that the manual created a contract between Osman and Peterson.**

[¶20.] At trial, Osman argued, and the circuit court agreed, that paragraph nine in the agency administrative policy manual impliedly requires an agent who solicits business, knowingly or otherwise, from another agent's clients to split the commission earned from any policy sold. The circuit court found this case analogous to *Osterkamp v. Alkota Manufacturing, Inc.*, 332 NW2d 275 (SD 1983), and ruled in favor of Osman. Peterson argues that *Osterkamp* does not apply in this context. Specifically, Peterson alleges that 1) the *Osterkamp* decision does not apply outside of the employer/employee context; 2) the *Osterkamp* decision should not be extended to an independent contractor setting; 3) *Osterkamp* should not be read to create contractual obligations between co-employees; and 4) the agency administrative policy manual is not specific enough to create contractual rights in accordance with *Osterkamp*.

_____

(. . . continued)
        to the defendants will be limited to Peterson, unless further distinction is
        necessary.

[¶21.]        In *Osterkamp*, the employee sued his former employer for wrongful discharge. 332 NW2d at 276. After a jury found for Osterkamp, the trial court granted a new trial, in part, because it found the verdict was not supported by the evidence. *Id.* On appeal, this Court noted that Osterkamp alleged during trial that the termination "violated the rules, regulations and disciplinary procedures in Employer's Employees Handbook." *Id.* The handbook, "list[ed] twenty-eight rules 'necessary for the orderly operation of Employer's business' and 'violations of the rules listed . . . will result in disciplinary action . . . .'" *Id.*

[¶22.]        While normally an employee works "at-will" in South Dakota and can be fired without cause, the employee handbook in *Osterkamp* specifically provided that "[t]he company will not discharge nor give disciplinary layoff to any employee without just cause." *Id.* at 277. Despite this assurance, Osterkamp was fired for disloyalty, which was not a basis for discharge in the disciplinary rules. Moreover, the testimony demonstrated he was fired without following any of the procedures for disciplinary action enumerated in the manual. Therefore, this Court held that the trial court abused its discretion in granting a new trial after the jury's verdict because the evidence supported the verdict. *Id.* at 277-79.

[¶23.]        The circuit court in this case found the precedent in *Osterkamp* created contractual obligations between Peterson and Osman, and it ordered the commissions split 60/40. We do not agree that *Osterkamp* is controlling precedent under these facts. However, SDCL 53-1-3 provides a basis to affirm the circuit court. We will affirm the circuit court if there is a basis on the record to do so. *See* Bunkers v. Jacobson, 2002 SD 135, ¶23, 653 NW2d 732, 739 (additional citations

omitted) (affirming the trial court when it reached the right result, albeit with the wrong reasoning).

[¶24.]    SDCL 53-1-3 in relevant part provides that "[a]n implied contract is one, the existence and terms of which are manifested by conduct." The language in the manual is specific and both Peterson and Osman were aware of the policy. The manual provides that once the agent contacts a protected client and generates interest, "then both the original agent and the agent who created the need or interest should hold the interview and split the case." While Peterson argues that "should" is permissive and not mandatory, the definition declares that should is used, "to express obligation, propriety, or expediency" or "to express what is probable or expected." Merriam-Webster's Online Dictionary, located at www.m-w.com (last accessed on February 26, 2008). Therefore, the language creates an obligation or expectation of splitting the commission.

[¶25.]    Moreover, there was testimony that commission splitting was common in the industry and specifically between the agents at Karlen & Associates. The circuit court found:

> That all of the insurance agents who testified at trial testified that it is common in the insurance industry for agents to split commissions, and every insurance agent that testified at the two day trial testified that he split commissions somewhere along the line with someone under some terms and conditions; not always the same, and obviously *usually* people agree and it's done in advance, *but not always*.[7]

---

7.    Karlen testified that in thirty years, this is the only time it has ever happened.

(Emphasis added). In addition, the circuit court listened to all the testimony and specifically rejected Karlen and Peterson's assertions that the policy was only a suggestion and in any event, did not apply to Security Mutual Life Products. It found:

> That if Mr. Karlen believed that the policy was only a suggestion, not binding on the parties or the Plaintiff had no rights under the Policy, this Court wonders why, when Jim Osman came to him with a complaint on or about June 10th, and the Court understands this date is disputed by the Defendants, Mr. Karlen did not say, "Jim you're crazy. We're not going to do anything because you have no legal rights under this document." This Court finds that Mr. Karlen did not say that but instead Mr. Karlen said he followed the normal procedure and he complied with the directive of the policy to get the agents together.
>
> This Court finds that such action is inconsistent with the Defendant Karlen's testimony that the Policy Manual was merely suggestive and/or permissive and not binding on the parties regarding the sale and commissions split of Security Mutual Products.

[¶26.]     Finally, both agents knew of the policy, yet continued to work with Karlen & Associates and there is nothing in the record that indicates either objected to the policy's terms. Indeed, both agents had split commissions on prior occasions with different agents. The manual was written to foster a good work environment for all agents. It limited competition by protecting agent's clients and ensured the agents were not continually calling the same people who were already clients. Moreover, it protected the original agent from losing commission money for his original sales. Specifically, Osman earned renewal commissions from his sales to the Hellwigs. When Peterson sold the GEAR policy to Osman's clients, the commissions stopped because the Hellwigs converted the executive bonus plan

previously sold by Osman into the GEAR policy sold by Peterson. Therefore, the policy ensures agents who may lose old commissions from their original clients get some new commissions from other agent's sales to their clients.

[¶27.] Osman has followed the policy on different occasions, expecting to be terminated if he did not split his commissions. Peterson has received the benefit of the policy and its protections and should be required to follow the policy on this occasion as well. The conduct of the parties sufficiently demonstrates there was an implied contract between Peterson and Osman at the time Peterson sold an insurance policy to Osman's clients. Therefore, we affirm the circuit court on this issue.

[¶28.] **3. Whether the circuit court erred when it failed to hold that plaintiff's claims in equity are barred by the doctrine of unclean hands.**

[¶29.] Peterson claims Osman's claims should be barred because of the doctrine of unclean hands. Specifically, Peterson argues that Osman tried to hinder the sale of the GEAR policy by telling the Hellwigs that it was not approved of by the IRS. Therefore, according to Peterson, Osman should collect nothing.

[¶30.] However, the circuit court listened to the testimony and rejected this defense. In a bench trial, the circuit court is the finder of fact and sole judge of credibility. There is nothing on this record that demonstrates the circuit court erred.

[¶31.] **4. Whether the circuit court erred in holding that the commission should be split 60/40.**

[¶32.] Peterson argues that the circuit court did not have the authority to order a 60/40 split. According to Peterson, the only testimony was that splits are

typically 50/50 if the original agent participates or 80/20 if the original agent does not participate in the new sale. Therefore, the circuit court could only choose between those two values.[8]

[¶33.]     Osman argues that the determination of the commission split amount is akin to property valuation in a divorce. Therefore, he argues that the circuit court has the authority to choose between a range of values. *See* DeVries v. DeVries, 519 NW2d 73, 75 (SD 1994). If that is the proper method, the valuation would not be set aside absent an abuse of discretion.

[¶34.]     However, the determination of damages in this case is not akin to property valuation. This is a breach of implied contract action and the measure of damage should be Osman's expectation damages. Bad Wound v. Lakota Community Homes, Inc., 1999 SD 165, ¶11, 603 NW2d 723, 726 (noting that the damages awarded in breach of contract situations "are designed to protect the expectations of the parties when they entered into the legally binding agreement."). We examine the record to determine the amount of Osman's expectation damages.

[¶35.]     The testimony reflects that Osman did not contribute to the sale. He argues that he asked to help, but Peterson claimed the sale was already complete. Regardless, it is undisputed that Osman did not assist in the sale. Nor is there any testimony that delineates a 60/40 split when an agent wants to help but is denied the opportunity. The only testimony on the record regarding the percentage of

---

8.     While not demonstrative of splits between *two agents*, the manual does show that when splits occur between the *agency* and selling agent, the splits are generally 50/50 or 80/20. *See supra* note 3.

commission split is that agents who do not assist in the new sale typically get an 80/20 split. Therefore, Osman's expectation damages are 20% of the commission for the GEAR policy sale, not the awarded 40%.[9] Therefore, we reverse on this issue and remand.

[¶36.] Affirmed in part, reversed in part and remanded.

[¶37.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and MEIERHENRY, Justices, concur.

---

9. Peterson also argues that the policy cannot create contractual rights because the remedy is not specific. However, the policy says to "split" the commission and the testimony regarding company course of dealing in these situations can be used to define an ambiguous term. *See* Mash v. Cutler, 488 NW2d 642, 647 (SD 1992).