2004 DSD 22

The **BURLINGTON NORTHERN AND SANTA FE RAILWAY CORPORATION, a Delaware corporation, Plaintiff,**

v.

**DAKOTA MISSOURI VALLEY AND WESTERN RAILROAD, INC., a North Dakota corporation, Defendant.**

State of South Dakota by and through its South Dakota Railroad Authority and Dakota Missouri Valley & Western Railroad, Inc., a North Dakota Corporation, Plaintiffs,

v.

Burlington Northern & Santa Fe Railway Company, a Delaware Corporation, Defendant.

Nos. CIV.03–1003, CIV.03–3012.

United States District Court,
D. South Dakota,
Northern Division.

Nov. 22, 2004.

Rory King, Bantz, Gosch, Cremer, Peterson, Sommers & Wager, Aberdeen, SD, Scott G. Knudson, Timothy R. Thornton, Briggs and Morgan, St. Paul, MN, for Burlington Northern and Santa Fe Railway Corporation.

Charles M. Thompson, May, Adam, Gerdes & Thompson, Pierre, SD, Patrick J. Neaton, Neaton Puklich and Klassen, Minnetonka, MN, for Dakota Missouri Valley and Western Railroad, Inc.

James D. Helenhouse, Myles L. Tobin, Thomas J. Litwiler, Fletcher & Sippel, LLC, Chicago, IL, Roxanne Giedd, Attorney General's Office, Pierre, SD, for State of South Dakota.

## MEMORANDUM DECISION AND ORDER

KORNMANN, District Judge.

[¶ 1] On March 19, 2003, Burlington Northern and Santa Fe Railway Corporation ("BNSF") filed in the Northern Division of the United States District Court for the District of South Dakota a diversity action against Dakota Missouri Valley and Western Railroad, Inc. ("DMVW"), seeking declaratory relief, injunctive relief, and damages based on DMVW's alleged past use and potential future use of BNSF's Aberdeen, South Dakota, interchange.

[¶ 2] On March 20, 2003, the State of South Dakota through the South Dakota Railroad Authority ("SDRA") filed a complaint against BNSF in the Sixth Judicial Circuit, Hughes County, South Dakota. The complaint seeks specific performance or injunctive relief enforcing the terms of a June 15, 2001, agreement between BNSF and SDRA which allegedly allows the SDRA and its claimed designees, namely the Dakota, Minnesota, and Eastern Railroad Company ("DME") and DMVW, the right to use the Aberdeen interchange for rail traffic handled on the SDRA's own rail lines to the north and south of Aberdeen. The complaint also seeks damages for breach of contract and tortious interference with the business relationships (1) between SDRA and DME, (2) between SDRA and DMVW, and (3) among various entities, including customers, regarding the transportation of goods on the SDRA's rail lines north through the Aberdeen interchange (to subsequently reach Canadian markets). In an amended complaint filed March 31, 2003, DMVW joined SDRA as a plaintiff. DME did not consent to join the action but was named as an involuntary plaintiff. BNSF timely filed a notice of removal and this case was removed to the Central Division of the United States District Court for the District of South Dakota. Despite motions by DMVW and SDRA to remand the case to state court, this court ordered that the action remain in federal court and that DME be dropped from the action. The two cases were consolidated on December 8, 2003, with CIV 03–1003 being the lead case (Doc. 41).

[¶ 3] Pursuant to Fed.R.Civ.P. 56(c), BNSF filed a motion for partial summary judgment (Doc. 46) on March 15, 2004. On July 30, 2004, SDRA filed its own motion for partial summary judgment (Doc. 63). Both of these motions primarily concern the effect of the 2001 "donation agree-ment." BNSF argues that this agreement did not grant the SDRA "bridge rights" that would allow SDRA to bypass BNSF on traffic movements through Aberdeen. SDRA argues that refusing to allow DMVW and DME to utilize BNSF trackage to interchange at Aberdeen violates the 2001 agreement and SDRA seeks permanent injunctive relief. On August 2, 2004, DMVW filed a motion for partial summary judgment (Doc. 67), seeking dismissal of BNSF's claims that DMVW tortiously interfered with BNSF's contracts, trespassed upon BNSF's railroad tracks, and is liable to BNSF for punitive damages. BNSF filed a motion to strike DMVW's motion for failing to comply with local rules (Doc. 85). This opinion addresses all motions filed.

## FACTUAL BACKGROUND

[¶ 4] This dispute concerns a segment of BNSF railroad track located slightly northeast of Aberdeen, and the contracts which govern the use of that track. There are three parties involved in the litigation. BNSF is a Delaware corporation with its principal place of business in Fort Worth, Texas. BNSF operates as a railroad throughout the United States, including the state of South Dakota. DMVW is a North Dakota corporation with its principal place of business in Bismarck, North Dakota. DMVW operates in North Dakota and South Dakota. SDRA is an agency of the State of South Dakota established by SDCL 49–16B–3 which is authorized to own and operate rail lines in furtherance of the state's purpose of developing the resources and improving the economic facilities of the state. SDRA owns rail lines at various locations in the state, including two rail lines in the vicinity of Aberdeen.

[¶ 5] An explanation of a few terms that will be used is necessary in order to understand the current issues. First, an "inter-

change track" or "interchange access line" is a stretch of rail line where traffic being hauled by one carrier is transferred or handed off to another carrier. Second, "bridge traffic" or "overhead traffic" refers to the movement of traffic by one carrier over the tracks of another carrier, sometimes to be interchanged with a third carrier. This term is of particular importance in this matter, which involves SDRA's desire to use BNSF's interchange access line and the "Britton Line" (which will later be described herein) as a "bridge" to carry traffic originated by DME south of Aberdeen to the Canadian Pacific ("CP") system north of the Britton Line.

[¶ 6] There are a few stretches of rail line that are of primary importance here. On April 22, 1982, the Burlington Northern Railroad Company ("BN"), BNSF's predecessor, took over the Chicago, Milwaukee, St. Paul & Pacific Railroad Company ("Milwaukee") east-west line (previously often referred to as the "main line") that runs across northern South Dakota and through Aberdeen. Various lines intersect with this line and the usage of those lines forms the controversy at hand. One such line extends south from Aberdeen. SDRA now owns this line, which extends from Aberdeen to Wolsey, South Dakota ("Wolsey Line"). SDRA acquired this line from the Milwaukee in 1981. The Wolsey Line is currently operated by BNSF, pursuant to an operating agreement with SDRA. DME has trackage rights to operate its trains on the Wolsey Line that arise from agreements executed by the Milwaukee, the predecessor of BNSF and SDRA, and the Chicago and North Western Transportation Company ("CNW"), the predecessor of DME. These agreements were executed on August 13, 1975 ("1975 agreement"), and July 10, 1977 ("1977 agreement"). The parties disagree over CNW's trackage rights under these agreements. BNSF claims that CNW's

rights under the 1975 agreement did not include the use of the Aberdeen interchange facilities. SDRA claims to the contrary that, prior to CNW's sale of its lines to DME in 1986, CNW had historically interchanged with both BN and Milwaukee on the Milwaukee east-west line in Aberdeen. SDRA also claims that CNW utilized the CNW interchange access in Aberdeen to receive and deliver cars moving to and from Milwaukee's east-west line as well as cars moving to and from BN's "Britton Line" and "Rutland Line," discussed below. At that time, CNW had its own interchange access line at Aberdeen. This was later abandoned when CNW was allowed to use the BN interchange access tracks.

[¶ 7] Some time after the execution of the 1975 and 1977 agreements, BN took over the operation of the Wolsey Line. On September 5, 1986, DME acquired CNW's South Dakota operations, including CNW's trackage rights under the 1975 agreement. This allowed DME to operate on the Wolsey Line. A supplemental agreement executed by BN and DME on October 8, 1986 ("1986 agreement"), delineated DME's trackage rights, including use of the BN interchange track in Aberdeen. The 1986 agreement contains the following language concerning DME's use of BN's track:

> DM & E shall also have the right to use Northern's Yard Trackage (also referred to as Joint Tracks) at Aberdeen for the expressed purpose of interchanging traffic with Northern. Said Interchange Track shall be designated by Northern's Superintendent and can be changed from time to time at Northern's sole discretion.

BNSF claims that this clause demonstrates that, although DME was allowed to interchange at Aberdeen, DME's rights were restricted to interchange with BN. SDRA claims that this language was not

meant as a restriction. Rather, it claims that this clause merely reflects the fact that BN was the only railroad which DME could have interchanged with in Aberdeen in 1986, since BN owned both the Britton Line to the north and the former Milwaukee east-west line. As successor by merger to BN, BNSF acquired BN's rights under the 1986 agreement, which is still in effect as to interchanges between DME and BNSF in Aberdeen.

[¶ 8] Another line that intersects with the BNSF east-west line in Aberdeen is the Britton Line. It runs between milepost 118.06, near Aberdeen and milepost 65.60, near Kidder, South Dakota, in the northeast portion of the state near the North Dakota border. Historically, BN and later BNSF were the owners of this stretch of track. The Britton Line was part of a BNSF north-south artery connecting that area of South Dakota with what eventually became BNSF's mainline in Aberdeen. Prior to acquiring the former Milwaukee east-west main line, BNSF reached Aberdeen only via a secondary branch rail line comprised of the Britton Line and the Rutland Line, a third line that is involved. The Rutland Line extends from the north end of the Britton Line at the North Dakota border to Geneseo Junction, North Dakota. BNSF sold this portion to Rutland Line, Inc. in 1997. It was purchased by SDRA in 2002.

[¶ 9] By the late 1990's, traffic on the Britton Line had significantly declined. The line was frequently taken out of service due to impaired track conditions brought on by water damage and muskrat infestation. BNSF considered abandoning the line. SDRA insisted that BNSF meet its common carrier responsibilities and take action to restore service on the Britton Line. In response, BNSF agreed to donate the Britton Line to SDRA. On June 15, 2001, BNSF entered into an agreement

("2001 agreement") with SDRA whereby BNSF transferred to SDRA the rail line and rail corridor ownership interests in portions of the Britton Line (between milepost 115.08 and 65.60) along with BNSF's rights to conduct rail freight transportation business on the Britton Line. SDRA also took over all common carrier obligations related to the Britton Line. The donation enabled BNSF to take advantage of a multi-million dollar federal charitable tax deduction. The 2001 agreement excluded from the transfer the "interchange access line" in Aberdeen, which includes the tracks between milepost 115.08 and milepost 118.6 on BNSF's Geneseo subdivision and the tracks between milepost 706.1 and milepost 707.1 on BNSF's east-west line. These sections of track are still owned by BNSF.

[¶ 10] The parties vehemently disagree over the effect of the 2001 agreement on the ability to interchange at Aberdeen. BNSF contends, that, in agreeing to the donation agreement, it remained committed to ensuring that competitors could not gain access through the interchange facility to traffic that would otherwise move on BNSF's system. As such, BNSF claims that the 2001 agreement only authorized SDRA to operate over the interchange access line under BNSF's control and direction and for the sole purpose of interchanging freight cars and equipment destined for or originating on the Britton Line. In other words, BNSF claims that it did not agree to the use of its interchange access line in order to accommodate bridge traffic to its competitor, CP.

[¶ 11] SDRA and DMVW obviously disagree with this characterization and cite the following language in paragraph 1(d) of the 2001 agreement:

> BNSF shall grant to Authority, effective on the date of Closing, and free of any charge payable by Authority to BNSF,

limited operating rights to conduct rail freight service only, for the sole purposes of interchanging freight cars and equipment, over BNSF's rail line at or near Aberdeen, South Dakota, between Milepost 115.08 and Milepost 118.6 of BNSF's Genesco subdivision, and between Milepost 706.1 and Milepost 707.1 of BNSF's main line, for the sole purpose of Authority or its designee interchanging rail cars and equipment at BNSF's Aberdeen Yard ... *In the event that Dakota, Minnesota and Eastern Railroad Corporation (DM & E) commences rail operations to Aberdeen, South Dakota, and Authority and DM & E wish to establish and conduct interchange at Aberdeen, nothing contained herein shall be construed to prohibit such interchange* (emphasis added).

SDRA and DMVW argue that this portion of the 2001 agreement granted them an unfettered right to interchange with DME in Aberdeen for whatever reason, including bridge traffic. Apparently, in an earlier draft of the 2001 agreement, BNSF had attempted to insert a restriction in paragraph 1(d) which would have limited SDRA to interchange at Aberdeen solely with BNSF. Under the language proposed by BNSF, SDRA could operate over the Aberdeen interchange track "for the sole purpose of interchanging freight cars and equipment between BNSF and [SDRA]" and "for the sole purpose of [SDRA] interchanging freight cars and equipment with BNSF at BNSF's Aberdeen yard." At the insistence of SDRA, the restrictive language was removed from the final draft of paragraph 1(d). Normally, this would have legal significance in the interpretation of an ambiguous contract. However, BNSF and SDRA agreed specifically to disregard this rule of construction. *See* paragraph 26 of the donation agreement.

[¶ 12] BNSF counters by noting that SDRA was only granted "limited operating

rights" over the interchange access lines. BNSF points out that paragraph 1(d) provides that SDRA's use of the interchange access line is "subject to the control and direction of BNSF, and to BNSF's operating and safety rules."

[¶ 13] Paragraph 15 of the 2001 agreement governs the scope of interchange rights. Paragraph 15(a) seems to contemplate that SDRA or its designee will interchange with BNSF at Aberdeen:

> [SDRA] or its designee and BNSF shall interchange rail freight cars and equipment to and from each other at Aberdeen, South Dakota, on such track(s) as BNSF shall designate.

Moreover, paragraph 20 states that BNSF will provide haulage to and from Wolsey and Aberdeen between DME and SDRA. However, BNSF argues, paragraph 20 provides that the haulage service is to be provided "only for rail traffic originating or terminating on the [Britton Line]." Further, in what BNSF claims is an effort to prohibit bridge traffic, paragraph 15(c) provides:

> Nothing in this agreement is intended to preclude SDRA or its designee from delivering traffic to or receiving traffic from any rail operator at or beyond Milepost 65.60 on the Rail Line, where such traffic originates or terminates on the Rail Line between Mileposts 115.08 and 65.60.

In other words, BNSF's position is that nothing in the 2001 agreement prohibits SDRA from receiving or delivering traffic on the north end of the Britton Line, as long as the cars originated or terminated on the Britton Line. However, BNSF claims that this section also prohibits traffic that did not originate or terminate on the Britton Line from traveling beyond the north end of the Britton Line.

[¶ 14] SDRA claims that the language in 15(c) was included only to handle any possible restrictions that may have been placed on the use of the Rutland Line. As previously stated, BNSF sold the Rutland Line to Rutland Line, Inc. ("RLI") in 1997. SDRA claims that it had concerns that BNSF may have placed restrictions in the 1997 sale agreement that required RLI to interchange solely with BNSF as to any traffic RLI handled that originated or terminated on the Britton Line. Once the Britton Line was transferred from BNSF to SDRA, it was not clear that RLI could continue to handle traffic to and from points on the Britton line since the traffic would be interchanged with a party other than BNSF, namely SDRA or its designee. Such restrictions would have had the potential to prevent SDRA from moving local Britton traffic northward. Consequently, SDRA claims, 15(c) was added at its request to clarify that such traffic could be moved northward and was not intended as any sort of restriction. The parties agreed, however, as already noted, to give no significance as to what party drafted what language.

[¶ 15] In 2002, SDRA acquired the Rutland Line from RLI. Because of contractual obligations set forth in the 1997 transaction between RLI and BNSF, BNSF's consent was required in order to effectuate this sale. BNSF formally executed the consent as part of the sales agreement between RLI and SDRA dated June 4, 2002. As a consequence, in addition to the Britton Line, SDRA owned the portion of the track from the North Dakota border to Geneseo Junction, North Dakota. SDRA thereafter leased the Britton and Rutland lines to DMVW for actual train operations. DMVW is SDRA's designee for shortline operations on the Britton and Rutland lines and possesses the rights and licenses of SDRA with respect to such transporta-

tion. As SDRA's designee, DMVW is also bound by the terms of the 2001 agreement.

[¶ 16] On two occasions in February 2003, DMVW and DME used BNSF's interchange access line and the Britton Line as a "bridge" to carry traffic originated by DME south of Aberdeen at Northville, South Dakota, to the Canadian Pacific ("CP") system north of the Rutland Line. DMVW also sought to interchange a third train with DME (which BNSF would not permit) and this train eventually interchanged with BNSF for movement to the Pacific Northwest.

## DISCUSSION

### I. SUMMARY JUDGMENT

[¶ 17] The summary judgment standard is well known and has been set forth by this court in numerous opinions. *See Hanson v. North Star Mutual Insurance Co.,* 1999 DSD 34 ¶ 8, 71 F.Supp.2d 1007, 1009–1010 (D.S.D.1999), *Gardner v. Tripp County,* 1998 DSD 38 ¶ 8, 66 F.Supp.2d 1094, 1098 (D.S.D.1998), *Patterson Farm, Inc. v. City of Britton,* 1998 DSD 34 ¶ 7, 22 F.Supp.2d 1085, 1088–89 (D.S.D.1998), and *Smith v. Horton Industries,* 1998 DSD 26 ¶ 2, 17 F.Supp.2d 1094, 1095 (D.S.D.1998). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c); *Donaho v. FMC Corp.,* 74 F.3d 894, 898 (8th Cir.1996). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1326 (8th Cir.1995). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party. *Donaho,* 74 F.3d at 898. Summary judgment is appropriate in contract cases when the relevant contract language is unambiguous. *Atkins*

v. Hartford Cas. Ins. Co., 801 F.2d 346, 348 (8th Cir.1986).

## II. BNSF MOTION FOR PARTIAL SUMMARY JUDGMENT

[¶ 18] BNSF argues that the 2001 agreement prohibits SDRA's use of its Aberdeen interchange access line and the Britton Line for bridge traffic and claims that it is entitled to summary judgment on that issue.

[¶ 19] Paragraph 22 of the donation agreement provides that South Dakota law governs the donation agreement. The applicable law is largely immaterial because there is not a substantial difference between federal and South Dakota contract principles. *Ambur v. United States,* 206 F.Supp.2d 1021, 1026 (D.S.D. 2002). In determining the proper meaning of a contract the court must seek to ascertain and give effect to the intention of the parties. *Bunkers v. Jacobson,* 2002 SD 135 ¶ 15, 653 N.W.2d 732, 738, and *Read v. McKennan Hosp.,* 2000 SD 66, ¶ 23, 610 N.W.2d 782, 786. The court ascribes to contract terms " 'their plain and ordinary meaning.' " *Harms v. Northland Ford Dealers,* 1999 SD 143, ¶ 12, 602 N.W.2d 58, 61 (quoting *Economic Aero Club, Inc. v. Avemco Ins. Co.,* 540 N.W.2d 644, 645 (S.D.1995)). " 'The court is to enforce and give effect to the unambiguous language and terms of the contract[.]' " *Kimball Investment Land, Ltd. v. Chmela,* 2000 SD 6, ¶ 14, 604 N.W.2d 289, 293 (quoting *Campion v. Parkview Apartments,* 1999 SD 10, ¶ 25, 588 N.W.2d 897, 902). Whether the language of a contract is ambiguous is a question of law. *Bunkers,* 2002 SD 135, ¶ 15, 653 N.W.2d at 738, and *Pesicka v. Pesicka,* 2000 SD 137, ¶ 6, 618 N.W.2d 725, 726. " 'A contract is not rendered ambiguous simply because the parties do not agree on its proper construction or their intent upon executing the contract.' "

*Singpiel v. Morris,* 1998 SD 86, ¶ 16, 582 N.W.2d 715, 719 (quoting 17A Am.Jur.2d *Contracts* § 338 (1991)). Rather, a contract is ambiguous only when "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement . . . ." *Id.*

[¶ 20] The court has reviewed the various contracts that were submitted by the parties, including the 2001 agreement. At the onset, it is worth noting that the 2001 agreement is no model of clarity. It is obvious that the primary issue that BNSF is concerned with in its motion is the potential use of its lines as a "bridge" to competitor's lines. In its brief, BNSF urges that, in donating the Britton Line, it was "committed to ensuring that competitors could not gain access through the interchange facility to traffic that would otherwise move on BNSF's system." BNSF memorandum of law in support of partial summary judgment, page 6. Why, then, did it not specifically act on the issue of bridge rights in the donation agreement? Considering what is at stake in this lawsuit, it is remarkable that the parties failed to squarely address the issue of bridge traffic anywhere in the 2001 agreement. It would have been simple for BNSF to have demanded a paragraph in the 2001 agreement that in plain language stated its intentions with respect to bridge traffic over its lines. No such clause is included.

[¶ 21] At the same time, there is no clause in the contract that affirmatively recites that SDRA has the right of interchange with DME that it now claims to have. The 2001 agreement may imply that interchange between DME and SDRA may be accomplished at Aberdeen, but does not expressly or clearly authorize it. Moreover, SDRA agreed to a number of contract terms that suggest that it or its

designee has only limited rights to interchange on track that BNSF continues to own. The issue of bridge rights was seemingly ignored by the parties in arriving at the 2001 agreement. It is frankly as though both parties used the ostrich approach of sticking their heads in the sand.

[¶ 22] Turning to the language of the contracts, it is first necessary to determine what is set forth in terms of interchange rights. A review of the various portions of the 2001 agreement governing the right to interchange reveals that SDRA may have the right to interchange with railroads other than BNSF in Aberdeen. Paragraph 1(d) grants to SDRA, free of any charge payable, the right to interchange freight cars in Aberdeen. Although SDRA's rights are termed "limited operating rights" and the rights are subject to various other restrictions to be discussed, no limitation specifically dictates the railroads with which SDRA may interchange.

[¶ 23] The rights of interchange possessed by DME are somewhat different. DME's rights of interchange in Aberdeen are governed by the 1986 contract it entered into with BN. Specifically, that agreement provides that "DM & E shall also have the right to use Northern's Yard Trackage (also referred to as Joint Tracks) at Aberdeen for the expressed purpose of interchanging traffic with Northern." This contract remains in effect as to DME's ability to interchange in Aberdeen.

[¶ 24] SDRA, as a condition of accepting the Britton Line, could easily have demanded that BNSF and DME enter into a supplemental agreement to clearly specify that DME and SDRA could interchange in Aberdeen. This would have addressed any lingering questions vis-a-vis the effect of the 1986 contract. Nothing of this nature was done or even sought. Consequently, the court is asked to decide, based on the "plain language" of the agreements in effect, whether the rights asserted by SDRA exist here.

[¶ 25] BNSF's claim that it acted to protect its competitive interests is called into question by SDRA and DMVW. Specifically, SDRA and DMVW argue that the donation agreement authorizes interchange with DME at Aberdeen, as the parties desire, based on the following language in paragraph 1(d):

> In the event that Dakota, Minnesota and Eastern Railroad Corporation (DM & E) commences rail operations to Aberdeen, South Dakota, and Authority and DM & E wish to establish and conduct interchange at Aberdeen, nothing contained herein shall be construed to prohibit such interchange.

The above is an example of extremely poor drafting. A plain reading of Paragraph 1(d) reveals that it does not grant SDRA or DMVW any affirmative right to interchange with DME at Aberdeen or vice versa. A contract should affirmatively set forth what the parties have agreed to do, rather than merely pointing to what is *not prohibited* by the contract. For example, a paragraph in the 2001 agreement could have just as easily have stated "nothing in the 2001 agreement shall be construed to prohibit SDRA from painting all of BNSF's trains yellow." Of course, that does not mean that the 2001 agreement grants SDRA the right to do this; it merely means that nothing in the contract should be construed to prohibit it. The fact that the 2001 agreement does not prohibit interchange between SDRA and DME in Aberdeen means very little in the absence of a contract affirmatively granting such a right.

[¶ 26] SDRA claims that the 1986 contract allowed DME to interchange in Aberdeen with any carrier, not just BNSF. SDRA also claims the "with Northern" language was included only because BN

was, as a point of fact, the only railroad in existence in Aberdeen at the time of the 1986 agreement. In this regard, SDRA seems to contend that interchange rights were already in place without the 2001 agreement. If this proposition was accepted, and DME had the right to interchange with any carrier all along, not just BNSF, then the language that is claimed to grant the same right to DME in paragraph 1(d) would be unnecessary and mere surplusage.

[¶ 27] Moreover, SDRA claims that since DME had the right to interchange with BNSF to go north up the Britton Line, DME would have the same rights when SDRA "stepped into BNSF's shoes" on the Britton Line. The problem with this argument is that BNSF retained ownership and control of the interchange access line, which includes the tracks on the Britton Line between mileposts 118.6 and 115.08 and the tracks on its main line between mileposts 706.1 and 707.1. SDRA could not step into BNSF's shoes as to trackage that BNSF continued to own and control.

[¶ 28] Unfortunately, neither the 2001 agreement nor any other recent document makes any reference to DME's rights under the 1986 contract. It may be that SDRA has the right to interchange with other carriers in Aberdeen but DME is permitted to interchange only with BNSF. In spite of SDRA's contentions to the contrary, neither the 1986 contract nor the 2001 agreement affirmatively provides that DME has a right to interchange with carriers other than BNSF in Aberdeen. DME was not a party to the 2001 agreement and DME has never made any attempt to bargain for rights greater than those provided it in the 1986 agreement. SDRA was not a party to the 1986 agreement which it now asks the Court to interpret.

[¶ 29] While SDRA and DMVW rely on the above-quoted portion of paragraph 1(d), other parts of the agreement suggest that rights of interchange are restricted. For instance, BNSF claims that it granted SDRA "limited operating rights" over its interchange access line. What is meant by "limited operating rights" is never explained or defined. BNSF also points out that SDRA or its designee is permitted to conduct its operations over BNSF's interchange access line "using its own trains, operated by its own employees, subject to the control and direction of BNSF, and to BNSF's operating and safety rules." Paragraph 1(d). Certainly, these portions of the very same paragraph relied upon by SDRA and DMVW suggest that BNSF maintained some amount of control over the use of its interchange access line. More importantly, as previously mentioned, BNSF retained ownership of the interchange access line. One wonders why BNSF insisted on retaining ownership of what is or was part of the Britton Line if BNSF intended to grant bridge rights.

[¶ 30] Other portions of the 2001 agreement add to the confusion. Paragraph 15 deals specifically with interchange. Paragraph 15(a) provides that "[SDRA] or its designee and BNSF shall interchange rail freight cars and equipment to and from each other at Aberdeen, South Dakota, on such track(s) as BNSF shall designate." The plain language of paragraph 15(a) seems to contradict the possible implication in paragraph 1(d) that SDRA can interchange with railroads other than BNSF. Indeed, paragraph 15(a) would suggest that SDRA is limited to interchanging with BNSF. There are no qualifications or exceptions to affirmatively deal with the possibility of interchange between SDRA and DME.

Paragraph 15(c) then goes on to provide:

Nothing in this agreement is intended to preclude SDRA or its designee from delivering traffic to or receiving traffic from any rail operator at or beyond Milepost 65.60 on the Rail Line, where such traffic originates or terminates on the Rail Line between Mileposts 115.08 and 65.60.

The effect of this paragraph is not as clear as BNSF argues. BNSF urges that paragraph 15(c) acts as a clear prohibition against bridge traffic. Perhaps this would be true if the paragraph read as follows: "only that traffic originating or terminating on the rail line between mileposts 115.08 and 65.60 shall be delivered or received at or beyond milepost 65.60." The intent of this paragraph as drafted may be to set forth the idea that the 2001 agreement does not prohibit Britton Line traffic from moving further north up the line. The language of the paragraph itself indicates that nothing in the agreement precludes this from happening. At the same time, nothing about this paragraph can be read as a prohibition of any kind. As earlier expressed, it is difficult to understand why parties to a contract would bother to state what the contract does not do. Careful drafting would set forth what the contract does rather than what it does not do, especially when dealing with such an important item as bridge rights.

[¶ 31] Nonetheless, it is peculiar that SDRA would include the last portion of quoted language from paragraph 15(c). If SDRA truly bargained for bridge rights and those bridge rights were incorporated into the 2001 agreement, then language indicating that Britton Line traffic is not precluded from moving north would be unnecessary. Stated another way, if SDRA's arguments were accepted, *no* traffic, not just that originating or terminating on the Britton line, would be precluded from moving past milepost 65.20 by the 2001 agreement. The final portion of the above paragraph would be superfluous. Yet, there is no question that SDRA drafted the language and insisted on it. But that is immaterial, as the parties agreed.

Paragraph 20 of the 2001 agreement states:

BNSF shall transport freight traffic as agent for and on behalf of [SDRA] over BNSF's rail line to and from BNSF's Aberdeen, South Dakota yard and interchange with Dakota, Minnesota and Eastern Railroad Corporation (DM & E) at or near Wolsey, South Dakota. Such haulage shall be furnished only for rail freight traffic originating or terminating on the [Britton Line] and interchanged with DM & E at or near Wolsey, South Dakota.

This portion, like much of the 2001 agreement, is confusing. First, the reference to "BNSF's rail line" does not make sense. Although the Wolsey Line is currently operated by BNSF, SDRA is the owner. It is curious that SDRA and BNSF paid no attention to this fact. Second, unlike paragraph 15(c), which merely provides that Britton Line traffic is not precluded from moving north, this paragraph seems to clearly limit the type of traffic which SDRA may send south. BNSF only agreed to haul SDRA's freight traffic "originating or terminating on the [Britton Line]." In other words, bridge traffic traveling south is not permitted. Obviously this does not necessary preclude such traffic that might be headed to the north.

The integration clause in paragraph 26 states:

This document, together with all Exhibits attached hereto, constitutes the entire agreement between [SDRA], BNSF and Railway relating to this transaction. Any other prior or contemporaneous agreements, understandings, representations or statements, whether oral or

written, relating to this transaction are merged herein.

\* \* \* \* \* \*

[3] The parties agree that the terms herein have been arrived at by mutual negotiation and that no terms herein shall be presumptively construed against either party regardless of who drafted it in the first instance.

Normally, the court would construe the ambiguities of a contract against the drafter. The general rule in contract law is that ambiguities arising in a contract should be interpreted and construed against the scrivener. *See e.g. Weekley v. Weekley,* 1999 SD 162, ¶ 34, 604 N.W.2d 19, 27, *Campion v. Parkview Apartments,* 1999 SD 10, ¶ 34, 588 N.W.2d 897, 904, and *Production Credit Ass'n v. Wynne,* 474 N.W.2d 735, 740 (S.D.1991). However, typically, this issue of contract ambiguity has been considered in contracts of adhesion, where one party with superior bargaining position drafts a form contract and the other party signs it with a twisted arm. In this case, the parties were arguably on a level bargaining plain when the 2001 agreement was executed. These are, at least supposedly, sophisticated parties. The 2001 agreement expressly provides that the terms are not to be presumptively construed against either party.

[¶ 32] After reviewing the 2001 agreement and the arguments set forth by both parties, it is clear to the court that this is a case where the contract is capable of more than one reasonable interpretation. Despite the various portions of the 2001 agreement that seem to favor BNSF's interpretation, the court is mindful of the fact that there is no prohibition against bridge traffic. At the same time, the 2001 agreement sends mixed messages as to the parties' interchange rights. Frankly, the 2001 agreement was not drafted in a manner that lends itself to clarity on the issue of interchange rights.

[¶ 33] Extrinsic evidence is necessary to resolve the dispute. The parties have parsed the language of the 2001 agreement extensively, and yet, no matter how the contract is read, it provides no clear answer to the fundamental question posed by this lawsuit: whether SDRA and DMVW have the right to utilize BNSF's interchange access line and the Britton Line as a bridge to carry DME traffic north to another carrier. The 2001 agreement has failed the parties in an area that could have been dealt with in a single paragraph addressing bridge rights. Consequently, because there are disputed issues of material fact, BNSF's motion for summary judgment must be denied.

## III. SDRA MOTION FOR PARTIAL SUMMARY JUDGMENT

[¶ 34] SDRA has filed its own motion for summary judgment asking the court to issue a permanent injunction. SDRA claims that injunctive relief is necessary here in order to avoid continuing harm to the state and its industries as a result of actions taken by BNSF in preventing trains from moving through Aberdeen between rail lines owned by SDRA.

[¶ 35] Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c); *Donaho v. FMC Corp.,* 74 F.3d 894, 898 (8th Cir.1996). SDRA argues that it is entitled to permanent injunctive relief based on the record herein. The standard for determining whether a permanent injunction should issue is essentially the same as the familiar standard for a preliminary injunction. *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). However, the movant must show

actual success on the merits. *Id.* at 546, 107 S.Ct. 1396. The Eighth Circuit Court of Appeals has identified four factors to be considered in determining whether or not to grant a permanent injunction:

1. the threat of irreparable harm to the movant;

2. the state of balance between this harm and the injury that granting the injunction will inflict on other parties;

3. whether the movant proves actual success on the merits; and

4. the public interest.

*Forest Park II v. Hadley,* 336 F.3d 724, 731 (8th Cir.2003), and *Dataphase Sys. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981) (setting forth the factors for injunctive relief). "A permanent injunction is ordinarily issued only 'after a full trial on the merits.'" *Chappell & Co., Inc. v. Frankel,* 367 F.2d 197 (2d Cir.1966) (citing Developments in the Law—Injunctions, 78 Harv. L.Rev. 994, 1056 (1965)).

[¶ 36] Many of the parties' arguments regarding the proper contractual construction were repeated in this motion. The parties' contractual arguments have been previously addressed. As previously stated, the Court finds that the 2001 agreement's ambiguity precludes the entry of summary judgment in favor of BNSF.

■ [¶ 37] The Court has considered the materials submitted by SDRA in support of its motion for summary judgment. Turning to the factors set forth above, a permanent injunction is not appropriate at this stage in the case. SDRA has not shown actual success on the merits. SDRA asks the Court to find that the 2001 agreement plainly provides that SDRA and its designee DMVW are able to interchange with DME at BNSF's Aberdeen yard on an unrestricted basis. As discussed above with respect to BNSF's mo-

tion, the Court is not able to make such a finding on the basis of the language in the 2001 agreement. The Court is cognizant of the fact that the 2001 agreement neglects to even mention bridge rights. This cuts both ways. The right to utilize another railroad's trackage to interchange and conduct bridge traffic is a right that should be bargained for and addressed in the contract. The 2001 agreement fails in this regard and, as a consequence, it would be inappropriate for the Court to provide the relief sought by SDRA, at least at this stage. At the same time, the 2001 agreement provides no clear prohibition against bridge traffic and flirts with various interpretations as to what parties have interchange rights and what those interchange rights are. Thus, judgment as a matter of law in favor of BNSF is also inappropriate at this point.

[¶ 38] SDRA asks the Court to look beyond the text to the negotiating history of the 2001 agreement. The Court is also not about to find in favor of SDRA as a matter of law on the basis of the documentary and testimonial evidence submitted. Such an endeavor would necessarily require the Court to make credibility assessments and would involve disputed issues of material fact. Indeed, in a 46 page diatribe, BNSF has denied and responded ad nauseum to nearly every aspect of SDRA's version of the negotiation history of the 2001 agreement (Doc. 84). Clearly, genuine issues of material fact exist which preclude summary judgment in SDRA's favor.

[¶ 39] Moreover, the negotiation history is not necessarily as favorable for SDRA as it presumes. SDRA argues that a critical element of the state's acquisition of the Britton Line was the ability to interchange traffic with DME at Aberdeen in order for shippers on DME rail lines to be able to access North Dakota and Canadian markets via the Britton and Rutland lines.

SDRA further argues that it advised BNSF of the critical nature of this priority. SDRA's evidence to this effect is that Dana Nelson ("Nelson"), one of the then governor's advisors, advised BNSF's Christopher Randall ("Randall") of SDRA's intention to use the rail lines as an access route to markets in North Dakota and Canada. BNSF claims that the state's negotiators neither asked for nor received bridge rights or overhead rights over the Britton Line. Randall testified that SDRA negotiators never mentioned any sort of bridge traffic. BNSF's position is that SDRA approached BNSF only about restoring local service to shippers on the Britton Line. BNSF also points out that not a single document in the back and forth between the parties requested or even mentioned these bridge rights. The fact that neither the finalized agreement nor any document mentions bridge rights demonstrates that both parties were shortsighted in negotiating the 2001 agreement. It certainly lends no concrete support to SDRA's contention that these rights are in place. At best, issues of credibility are present.

[¶ 40] The parties also disagree over the negotiation history of paragraph 1(d). SDRA places a great deal of emphasis on alterations made to this paragraph. Specifically, SDRA argues that an earlier draft of paragraph 1(d) would have limited SDRA to interchange at Aberdeen solely with BNSF. That language was changed to the current version, which provides no such limitation and includes language indicating that the 2001 agreement does not prohibit interchange with DME. With or without such language as to SDRA's ability to interchange with other carriers, the 2001 agreement does not grant DME greater interchange rights than those it already possessed. DME's right to interchange on BNSF track continues to be governed by the 1986 agreement. Until

the court or the jury considers all of the extrinsic evidence, the fact that SDRA may be able to interchange with carriers other than BNSF in Aberdeen is only one piece of the puzzle and does not carry the day.

[¶ 41] Beyond the negotiation history, if the Court is to consider extrinsic evidence to resolve the dispute, there are also significant issues of fact as to the historical usage of the interchange access line and Britton Line. As stated, there is significant disagreement about DME's ability to interchange in Aberdeen. While SDRA contends that DME and its predecessors have a long standing history of interchanging its traffic on any of BNSF's lines, BNSF argues that the Britton Line has never been used for bridge traffic. Rather, BNSF argues that it has always been used to support local traffic and there was never any custom or practice of using the Britton Line for bridge traffic.

[¶ 42] Because SDRA has not shown actual success on the merits, the other criteria for permanent injunction are somewhat irrelevant. Accordingly, after careful consideration of the entire file, the Court concludes that genuine issues of material fact exist precluding entry of summary judgment in the nature of a permanent injunction. SDRA's motion for summary judgment should be denied.

## IV. DMVW MOTION FOR PARTIAL SUMMARY JUDGMENT

[¶ 43] At its heart, this action is a contract dispute. Nonetheless, BNSF has alleged various tort claims in its complaint. DMVW has moved for partial summary judgment on the tort claims alleged in BNSF's complaint. Specifically, this motion addresses BNSF's claims that DMVW tortiously interfered with BNSF's contracts, trespassed upon BNSF's railroad

tracks, and is liable to BNSF for punitive damages.

[¶ 44] As with any motion for summary judgment, the moving party bears the burden to demonstrate that there is no genuine issue of material fact. However, BNSF may not simply point to allegations made in the complaint but must identify and provide evidence of specific facts creating a triable controversy. *Jaurequi v. Carter Mfg. Co.,* 173 F.3d 1076, 1085 (8th Cir.1999).

[¶ 45] BNSF alleges in Count IV of its answer and counterclaim that DMVW tortiously interfered with BNSF's 1986 agreement with DME. DMVW counters that it had no knowledge of these agreements and there is no evidence to the contrary. Whether or not DMVW had knowledge of these contracts is of great significance, as the Supreme Court of South Dakota has defined the elements of tortious interference with contracts as follows:

(1) The existence of a valid business relationship;

(2) *Knowledge by the interferer of the relationship;*

(3) An intentional and unjustified act of interference on the part of the interferer;

(4) Proof that the interference caused the harm sustained;

(5) Damage to the party whose relationship whose relationship was disrupted (emphasis added).

*Tibke v. McDougall,* 479 N.W.2d 898, 908 (S.D.1992).

[¶ 46] In essence, BNSF argues that DMVW was on actual or constructive notice that the 1986 agreement was in existence and prohibited DME from interchanging with other carriers in Aberdeen. BSNF claims that, in 2001, Lynn Anderson ("Anderson"), a DME representative, informed Jeff Wood ("Wood"), a DMVW representative, that its operating rights in Aberdeen were governed by an agreement with BNSF. BNSF relies on the following portion of Wood's testimony:

Q. Do you understand that the access DME claims to have in Aberdeen is governed by an agreement between the Burlington Northern Santa Fe (an inaccurate statement since it was BNSF's predecessor, the BN) and the DME entered into in 1986?

A. Like I said, I know they said there is an agreement, but I don't know the specifics of what the agreement was. I've seen some of that correspondence in the litigation, but I don't know specifically from them what they use as an assumption.

BNSF's selective quotation of Wood's deposition fails to recognize that Wood was also told by Anderson that DME had operating rights to come to Aberdeen. The knowledge of the relationship or expectancy that BNSF claims existed here on the part of DMVW is more than tenuous. "To be subject to liability under the rule stated in this Section, the actor must have knowledge of the contract with which [it] is interfering and of the fact that [it] is interfering with the performance of the contract." *Restatement (2d) Torts,* § 766, comment i.

[¶ 47] BNSF relies on *D 56, Inc. v. Berry's Inc.,* 955 F.Supp. 908, 916 (N.D.Ill. 1997). In that case, plaintiff D56, a manufacturer and distributor of various porcelain and ceramic figures and other accessories, brought suit against Jeffrey Berry and Berry's World ("Berry's"), a retailer and its proprietor. D56 sold its collections only to authorized dealers of its merchandise. Each authorized dealer was required to sign an authorized dealer policy in which the dealer agreed to resell D56's collections at retail and refrain from trans-

shipping the collections to other retailers, wholesalers, or authorized dealers without D56's permission. Berry's and other retailers who were not authorized dealers obtained D56 collections from one of D56's authorized dealers. This dealer neither sought nor received permission to transship D56's collections to Berry's. D56, upon learning of this practice, brought suit against Berry's claiming, among other things, tortious interference with contractual relations. D56 claimed that the defendants knew of its policy and long-standing practice to sell its collections only to its authorized dealers and knew of each authorized dealer's agreement not to transship plaintiff's collections to other retailers. In support, D56 pointed to a letter its attorney sent to Berry's which read, in pertinent part, as follows:

> The purpose of this letter is to put you on notice that Department 56 sells [the Collections] to our authorized dealers only, and that a provision in the relationship between each authorized dealer and Department 56 is that the authorized dealer is prohibited from re-selling or transshipping Department 56 products to another location or dealer without prior written consent. Your continued unauthorized acquisition of Department 56 products from any of our dealers would constitute inducement of those dealers to breach their contracts with Department 56 and wrongful interference in our business relationship with them.

*Id.* at 916.

[¶ 48] Berry's continued to acquire and sell the collections after receipt of this letter. The district court found that Berry's had knowledge of the contractual relationship between D56 and the authorized dealer that transshipped the collections:

> This court finds that, regardless of whether defendants received a copy of

the agreement or their subjective belief regarding the effect of such an agreement, the December 1994 letter put Berry's World and Berry on notice that a valid contract existed between plaintiff and its authorized dealers. *Restatement (2d) Torts*, § 766, comment i (defendant's subjective belief regarding the effect of the contract does not dispel defendant's knowledge of the contract). Moreover, taken as a whole, the notice letter and the other evidence of defendants' "constructive" knowledge would allow a reasonable jury to conclude that defendants knew of an agreement between plaintiff and Doe Companies, and that defendants knew the agreement prohibited the Doe Companies from transshipping the Collections to unauthorized dealers.

*Id.*

[¶ 49] *D 56* is distinguishable from the instant case in a number of respects. BNSF has failed to demonstrate that DMVW had any appreciable knowledge of the supplemental 1986 contract with which it is claimed to have interfered. Unlike the plaintiff in *D 56*, prior to the initiation of this lawsuit, BNSF did nothing to alert DMVW of its contractual relationship with DME. DMVW's understanding that there was an agreement in place was marginal at best. As evidenced by the quoted testimony above, in 2001, Wood knew of the existence of some agreement, but that was all. He testified that he did not know whether DME's rights to come to Aberdeen were governed by the 1986 agreement. The fact that DMVW, through Wood, may have had a general knowledge of the existence of a contract is not significant. Obviously, any railroad with track that intersects that of another railroad is going to have some contract in place. The terms of a contract of this nature could vary greatly. In this case, the evidence demonstrates that Wood

was of the belief that DME had the operating rights to come to Aberdeen and this belief was based upon representations made to him by representatives from DME. BNSF has not produced any evidence that Wood had any knowledge of restrictions as to DME's ability to interchange in Aberdeen prior to the initiation of this lawsuit.

■ [¶ 50] In fact, DMVW's knowledge of the contractual relationship between BNSF and DME may well have been founded in part on the only portion of the 2001 agreement which mentions DME:

In the event that Dakota, Minnesota and Eastern Railroad Corporation (DM & E) commences rail operations to Aberdeen, South Dakota, and Authority and DM & E wish to establish and conduct interchange at Aberdeen, nothing contained herein shall be construed to prohibit such interchange.[1]

The 2001 agreement makes no mention of the 1986 agreement. after reading this portion of the 2001 agreement, DMVW can hardly be blamed for thinking that DME had the right to interchange with it in Aberdeen. BNSF is overly presumptuous based on the language of the 1986 agreement, which is an agreement that neither Wood nor anyone at DMVW reviewed or were advised about prior to the commencement of this lawsuit. Summary judgment is appropriate as to BNSF's claim that DMVW interfered with its contracts with DME.

■ [¶ 51] Likewise, BNSF's claim that DMVW interfered with the 2001 agreement between BNSF and SDRA fares no

better. DMVW is SDRA's acknowledged designee under the donation agreement and has essentially stepped into the shoes of SDRA for purposes of the 2001 agreement. Indeed, SDRA was required by paragraph 1(f) of the 2001 agreement to designate a qualified rail service operator prior to the commencement of rail operations on the Britton Line and DMVW was the chosen operator. Without DMVW, SDRA's acquisition of the Britton Line would be meaningless. To that end, the court agrees that BNSF is now arguing that DMVW is guilty of tortious interference with DMVW's own contract. " 'One contracting party does not have a cause of action against the other for conspiring to breach [its][own] contract or for wrongfully interfering with its own contract.' " *Landstrom v. Shaver*, 561 N.W.2d 1, 17 (S.D.1997) (quoting *DP Serv., Inc. v. AM Int'l*, 508 F.Supp. 162, 167 (N.D.Ill.1981)). The fact that DMVW is a "lessee" to the SDRA makes no difference and BNSF offers no legal support for its argument that this somehow makes its claims viable. DMVW is the designee under the donation agreement and, at all times since the 2001 agreement went into effect, has been operating on the Britton Line. Summary judgment is appropriate as to this claim as well.

[¶ 52] BNSF also claims that DMVW is guilty of an intentional trespass to BNSF's property because DMVW interchanged the two 75 car corn trains with DME through BNSF's Aberdeen yard in February 2003. BNSF's trainmaster, Wilbert Kissner ("Kissner"), specifically authorized DMVW to use the Aberdeen yard and physically

---

1. The Court does not find this language to be determinative as to the other motions, but as to DMVW's knowledge of the relationship between DME and BNSF, the evidence shows that this is the only agreement with which DMVW was familiar. As a consequence, irrespective of the ultimate determination of the issue of whether DME may interchange bridge traffic at the Aberdeen interchange access line, the 2001 agreement is relevant for purposes of determining whether there is a material issue of fact as to whether DMVW had knowledge of the arrangement between DME and BNSF.

hook on to both of the 75 car trains that were interchanged to DMVW by DME in February 2003.

[¶ 53] Trespass is simply defined as an unauthorized entry on the property of another. Obviously, consent is a defense to a trespass claim. Restatement (2d) of Torts § 892A provides that, in order to be effective, consent must be by one who has capacity to consent and the consent must be tailored to the particular conduct or to substantially the same conduct. In a rather unusual tack, BNSF argues that its *trainmaster*, of all people, lacked the capacity or authority to allow the interchange to take place because the interchange was not authorized by BNSF contracts and BNSF employees are not permitted to act in a manner inconsistent with BNSF contracts. This claim flies in the face of all common sense and merits little discussion. The Court is not about to accept any argument that Kissner, the person charged with the responsibility of seeing to it that physical train operations in BNSF's Aberdeen yard are conducted appropriately, lacked the authority to consent to the entry of DMVW or any other carrier for that matter. If BNSF's employees failed to act in accord with BNSF contracts and consented to improper train movements, that is a BNSF problem, not an actionable tort. Consequently, DMVW's motion for summary judgment should be granted as to BNSF's trespass claim.

[¶ 54] Finally, DMVW asks the Court to grant summary judgment as to BNSF's claim for punitive damages. There is no right under South Dakota law to recover exemplary damages at all unless expressly provided by statute. *See* SDCL 21–1–4. The statute expressly providing for such damages is SDCL 21–3–2 which states:

In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful and wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

It is necessary to prove one of the three stated elements: oppression, fraud, or malice. *Biegler v. American Family Mut. Ins. Co.*, 2001 SD 13, ¶ 44, 621 N.W.2d 592, 605. Punitive damages are not ordinarily available in breach of contract claims. *Nelson v. WEB Water Development Assoc., Inc.*, 507 N.W.2d 691, 700 (S.D.1993). Thus, in all likelihood, BNSF would not be entitled to punitive damages unless it was able to establish an independent tort, separate and distinct from a breach of contract. *See Ducheneaux v. Miller*, 488 N.W.2d 902, 914–15 (S.D.1992).

[¶ 55] BNSF would have the Court believe, based on an email communication between SDRA representatives, that SDRA, DMVW, and DME have conjured up a nefarious scheme to secretly exploit BNSF's interchange access lines in order to accomplish bridge movements. This argument has no merit in light of the ambiguities in the 2001 agreement, which could have lead DMVW to believe that the "scheme" that it was allegedly in on was perfectly permissible. It is impossible to even infer that DMVW acted maliciously when the email communications that BNSF relies on were exchanged by SDRA representatives, not DMVW employees. At any rate, none of the evidence in the record even suggests that DMVW acted maliciously. BNSF's claims for punitive damages are frivolous.

[¶ 56] Simply stated, this lawsuit is a contract dispute. BNSF's attempt to convert it into a tort action is ill-conceived, and DMVW's motion for partial summary judgment should be granted as to BNSF's tort claims and claims for damages.

## V. BNSF MOTION TO STRIKE

 [¶ 57] BNSF also filed a motion to strike DMVW's motion for summary judgment (Doc. 85), claiming that DMVW's summary judgment motion is not in compliance with D.S.D. LR 56.1. Courts have consistently held that the various papers submitted in support of or in opposition to summary judgment motions are not pleadings as contemplated by Rule 12(f). *See e.g. Charles E. Hill & Associates, Inc. v. CompuServe, Inc.*, No. IP97–0434–C–M/S, 2000 WL 1473875, at * 11 (S.D.Ind. August 24, 2000) ("Motions, briefs, affidavits, and evidentiary matters submitted in support of, or in response to, a motion for summary judgment are not 'pleadings' within the meaning of Rule 12(f)."), *International Longshoremen's Ass'n Steamship Clerks Local 1624, AFL–CIO v. Virginia Int'l Terminals, Inc.*, 904 F.Supp. 500, 504 (E.D.Va.1995) (summary judgment briefs and affidavits are not pleadings; therefore, a motion to strike is not a proper method for challenging such briefs and affidavits), and *Meredith v. Allsteel, Inc.*, 814 F.Supp. 657, 660 (N.D.Ill.1992) (Rule 12(f) permits motions to strike matters at the pleading stage, not at the summary judgment stage). BNSF's motion to strike should be denied.

### ORDER

[¶ 58] Now, therefore,

[¶ 59] IT IS ORDERED, as follows:

(1) BNSF's motion for summary judgment (Doc. 46) is denied.

(2) SDRA's motion for summary judgment (Doc. 63) is denied.

(3) DMVW's motion for summary judgment (Doc. 67) is granted.

(4) BNSF's motion to strike (Doc. 85) is denied.

[¶ 60] Dated this 18th day of November, 2004.